929 F.2d 1404
 59 USLW 2634, 59 USLW 2647, 1991-1 Trade
Cases 69,395,
19 Fed.R.Serv.3d 644
 Vinod C. BHAN, C.R.N.A., Plaintiff-Appellant,
v.
NME HOSPITALS, INC., a Delaware Corp., dba: Manteca
Hospital, National Medical Enterprises, Inc., a Nevada
Corp., California Society of Anesthesiologists, Inc., a
California Corp., John E. Menaugh, Yong Suk, M.D.,
Defendants-Appellees.
 Nos. 87-2727, 87-2951.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 11, 1990.
Decided March 25, 1991.
 
 Timothy E. Morgan, San Francisco, Cal., H.E. Christian Peeples, Oakland, Cal., Michael I. Spiegel, Spiegel, Liao & Kagay, and Stephen Kaus, Kaus & Kerr, San Francisco, Cal., for plaintiff-appellant.
 Robert Fabrikant, McKenna & Cuneo, Washington, D.C., and James J. Banks, Damrell, Damrell & Nelson, Michael C. Normoyle, Normoyle & Newman, Modesto, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of California.
 Before SNEED, SCHROEDER and CANBY, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 This is an antitrust case concerning the exclusion of a class of nonphysician anesthesia providers from a hospital. Plaintiff Vinod Bhan charged the hospital with violations of Secs. 1 & 2 of the Sherman Act.[1] The district court granted summary judgment for defendants. Bhan appeals the summary judgment as well as discovery sanctions imposed by the magistrate. We affirm both rulings.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Vinod Bhan is a certified registered nurse anesthetist ("CRNA") who worked at Manteca Hospital between 1979 and 1983. CRNAs are licensed to perform many of the same anesthesia services as physician anesthesia providers ("MDAs"). The physician providers have a medical degree and are trained to perform certain complicated procedures that nurse providers cannot perform. The physicians also charge higher fees than the nurses.
 
 
 3
 Manteca Hospital is a forty-nine bed facility located in a town of 37,000 people. Although Manteca Hospital is the only hospital in its town, at least five hospitals in neighboring towns are approximately thirty minutes drive from Manteca Hospital. It is generally accepted in the health industry and uncontested in this case that hospitals within thirty minutes traveling time of each other compete for patients. Bhan v. NME Hospitals, Inc., 669 F.Supp. 998, 1006 (E.D.Cal.1987). In addition, five other hospitals are located in the general area, although the record is unclear about precisely how close these hospitals are to Manteca Hospital.
 
 
 4
 Most of the doctors who have staff privileges at Manteca Hospital also have staff privileges at hospitals in Stockton and Modesto. In addition, many of the doctors at Manteca Hospital arrange for "coverage" by doctors based outside of the town of Manteca, most commonly in Tracy, Stockton, or Modesto. During the period that Bhan worked at Manteca Hospital, he also worked occasionally at hospitals in eight other communities and at certain family planning clinics.[2]
 
 
 5
 Some hospitals in the area do not use nurse anesthetists, but at least one hospital in the area, and possibly two, do. In addition, doctors who perform outpatient surgery in their offices use nurse anesthetists.
 
 
 6
 Manteca Hospital obtained anesthesia providers from Associated Anesthesia Services ("AAS"), an organization that supplied the hospital with physician and nurse anesthesia providers and handled all billing and collections. AAS assigned Bhan and one physician to cover the Hospital's requirements.
 
 
 7
 The hospital and its surgeons became unhappy with the anesthesia coverage provided by AAS because of constant turnover in the physician provider position and lack of 24-hour coverage by a physician provider. The hospital asked AAS to provide an additional physician. AAS refused because it felt that the volume of work at the hospital could not support three anesthesia providers. The hospital then notified AAS that its contract would not be renewed. At the time of this notice, Mr. Bhan and Dr. Cull, a physician anesthesia provider, worked at Manteca under the AAS contract. Dr. Suk, a physician anesthesia provider from a neighboring town, also had expressed interest in moving to Manteca to work at the hospital.
 
 
 8
 The hospital notified Dr. Cull that after the AAS contract expired, he would no longer be allowed to work there and that the hospital intended to form an exclusive arrangement with some combination of anesthesia providers. In response, Cull's attorney threatened legal action if the hospital signed an exclusive agreement that did not include Cull. At this point, the hospital learned that a Fifth Circuit decision had raised doubts about the legality under the antitrust laws of an exclusive contract for anesthesia services at a hospital. See Hyde v. Jefferson Parish Hosp. Dist. No. 2, 686 F.2d 286 (5th Cir.1982), rev'd, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). The hospital decided not to pursue any exclusive contracts.
 
 
 9
 Instead, the hospital implemented an MDA-only policy, thus risking being impaled on the other horn of an antitrust dilemma. Any physician anesthesia provider under this new policy would be allowed to apply for staff privileges but no nurses could apply. The hospital offered three justifications. First, surgeons were afraid they would be held legally accountable for mistakes made by nurses because state law required the surgeon to "sign off" on the nurse's patient report. No sign-off was required for physicians. Second, the hospital felt that 24-hour coverage by a physician provider was essential in case of complicated emergencies. Third, the hospital felt physician anesthesia providers were better trained than nurse anesthesia providers. Malpractice claims and the cost of malpractice insurance lurk behind these justifications.
 
 
 10
 Dr. Suk and Dr. Cull became the two primary anesthesia providers under the new policy. They split the coverage schedule.
 
 
 11
 Bhan, the excluded provider, alleges that patient care and legal liability were
 
 
 12
 smokescreen issues. He claims that Suk and Cull conspired with the hospital to eliminate him and other potential nurse applicants from competing in the local market in order to protect the doctors' income. Bhan characterizes the arrangement as a group of suppliers (the doctors) convincing a buyer (the hospital) to join a conspiracy to boycott the suppliers' lower-priced competitors.
 
 
 13
 The district court initially dismissed the claim on the ground that Bhan lacked antitrust standing. This court reversed. The district court then granted defendants' motion for summary judgment. Bhan appeals the summary judgment grant as well as discovery sanctions imposed by the magistrate and affirmed by the district court.
 
 II.
 JURISDICTION AND STANDARDS OF REVIEW
 
 14
 The district court had jurisdiction under 15 U.S.C. Secs. 15, 22 (1988). This court has appellate jurisdiction according to 28 U.S.C. Sec. 1291 (1988). A grant of summary judgment is reviewed de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
 
 III.
 SUMMARY JUDGMENT
 
 15
 Summary judgment is appropriate where no genuine issue of material fact exists and a party is entitled to prevail in the case as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). The party requesting summary judgment has the initial burden to show that there are no genuine issues of material fact. T.W. Elec. Serv. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 632 (9th Cir.1987). He does not necessarily need to put on evidence to negate his opponent's claim; he may simply point to portions of the pleadings, admissions, answers to interrogatories, and depositions which, along with any affidavits, show the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).
 
 
 16
 If the moving party satisfies his initial burden, the opposing party may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists. Fed.R.Civ.P. 56(e). In addition, the dispute must be genuine. The "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 17
 In general, it is difficult to resolve antitrust cases on summary judgment because of their factual complexity. See Rickards v. Canine Eye Registration Found., 783 F.2d 1329, 1332 (9th Cir.1986), cert. denied, 479 U.S. 851, 107 S.Ct. 180, 93 L.Ed.2d 115 (1986). This does not mean, however, that a district court may not award summary judgment when appropriate. In fact, an appropriate award of summary judgment may save the parties and the courts from unnecessarily spending the extraordinary resources required for a full-blown antitrust trial. The Supreme Court's decision in Matsushita significantly clarified the standards for resolving summary judgment cases in the antitrust arena. See Matsushita, 475 U.S. at 585-88, 106 S.Ct. at 1355-57; see also Bhan, 669 F.Supp. at 1004-05. Since that time, this court has shown on numerous occasions that summary judgment on an antitrust claim may be appropriate. See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1488-92 (9th Cir.1991); R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 152-53 (9th Cir.1989) (en banc); Eichman v. Fotomat Corp., 880 F.2d 149, 161-63 (9th Cir.1989); Thurman Indus., Inc. v. Pay'N Pak Stores, Inc., 875 F.2d 1369, 1380 (9th Cir.1989); Christofferson Dairy, Inc. v. MMM Sales, Inc., 849 F.2d 1168, 1175 (9th Cir.1988); Ferguson v. Greater Pocatello Chamber of Commerce, 848 F.2d 976, 984 (9th Cir.1988).
 
 IV.
 SECTION 1 OF THE SHERMAN ACT
 
 18
 Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. Sec. 1. Long ago it was recognized that this language cannot be read strictly. Were it so read, a vast array of competitive activities, could be considered "restraints of trade" and therefore illegal. See United States v. Topco Assocs., 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The Supreme Court many years ago, however, ruled that the Act was intended to prohibit only those restraints of trade that are unreasonable.[3]
 
 
 19
 Thus, to establish a claim under Sec. 1 of the Sherman Act, the plaintiff must show 1) that there was a contract, combination, or conspiracy; 2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and 3) that the restraint affected interstate commerce. T.W. Elec., 809 F.2d at 632-33. The district court found that the plaintiff offered sufficient evidence of a conspiracy to survive summary judgment and that the restraint affected interstate commerce. The parties do not challenge these findings. As the district court saw it, however, the plaintiff's showing on the unreasonable restraint of trade issue was insufficient to survive the defendants' showing and summary judgment motion. The only issue raised on appeal, therefore, is whether the practice was an unreasonable restraint of trade.
 
 
 20
 To determine whether a practice unreasonably restrains trade, we sometimes apply a "rule of reason" analysis. See Hahn v. Oregon Physicians' Serv., 868 F.2d 1022, 1026 (9th Cir.1988), cert. denied, --- U.S. ----, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989). Under this test, we must analyze the degree of harm to competition along with any justifications or pro-competitive effects to determine whether the practice is unreasonable on balance. Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir.1988).[4] The focus is on the actual effects that the challenged restraint has had on competition in a relevant market.
 
 
 21
 Some practices, however, are so likely to interfere with competition that they violate the Sherman Act per se. In these cases, we do not require evidence of any actual effects on competition because we consider the potential for harm to be so clear and so great. See R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 151 (9th Cir.1989) (en banc) (per se rule applies only where experience has established that anti-competitive consequences flow regularly from the practice). Plaintiffs generally seek initially to have the defendant's conduct classified as a per se violation because it greatly simplifies the proof required. Examples of practices which are illegal per se include horizontal price-fixing, division of markets, and certain tying arrangements. Hahn, 868 F.2d at 1026; see Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 16-17, 104 S.Ct. 1551, 1560-61, 80 L.Ed.2d 2 (1984). In addition, some, but not all, boycotts are considered illegal per se. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 293-94, 105 S.Ct. 2613, 2618-19, 86 L.Ed.2d 202 (1985); Rickards v. Canine Eye Registration Found., 783 F.2d 1329, 1333 (9th Cir.1986).
 
 
 22
 In this case, the plaintiff, like others, first argued that the hospital's policy of admitting physician anesthesia providers only was 1) the type of boycott which is illegal per se and 2) if not a per se violation, then an unreasonable restraint under the rule of reason. The district court, in determining whether a per se violation had occurred, ruled that the hospital's policy had to be analyzed as a tying case rather than a boycott case. The first issue we must address is whether a tying case analysis was proper in this case. If such analysis was improper, we must next decide whether the "boycott" was a per se violation. If neither analysis leads to a per se violation, we must then address this case under the rule of reason. To these tasks we now turn.A. Did the District Court Err in Holding That the Hospital's Policy Should Be Analyzed as a Tying Case Under Jefferson Parish?
 
 
 23
 Tying exists when a seller refuses to sell one product unless the buyer also purchases another. To prove an illegal tie, a party must show 1) a tying of two distinct products or services, 2) sufficient economic power in the tying product market to affect the tied market, and 3) an effect on a substantial amount of commerce in the tied market. Roberts v. Elaine Powers Figure Salons, Inc., 708 F.2d 1476, 1479 (9th Cir.1983). In Jefferson Parish, the Supreme Court found that a hospital had engaged in a tie-in when it required patients who purchase operating room services to purchase the hospital's chosen anesthesia service. Jefferson Parish, 466 U.S. at 24, 104 S.Ct. at 1564. The Court, unlike the Fifth Circuit, refused to find an anti-trust violation, however, because the plaintiff failed to show sufficient market power in the tying product market. Id. at 25-29, 104 S.Ct. at 1565-67.
 
 
 24
 The district court applied the Jefferson Parish analysis to Manteca Hospital's arrangement. The court considered whether the hospital was forcing people who wanted to purchase surgical services to purchase the services of the hospital's chosen anesthesia provider. The court found that the hospital could not have engaged in such illegal tying because the hospital did not possess sufficient economic power in the market for hospital services (the tying market). In other words, enough competition existed among hospitals in the area that any patient who did not like Manteca's anesthesia provider could go to another hospital.[5]
 
 
 25
 Bhan does not, and in the light of the Supreme Court's Jefferson Parish decision cannot, challenge the court's conclusion that the hospital did not engage in an illegal tying arrangement. Bhan argues, however, that the hospital's actions should not be evaluated as a tying arrangement at all. Rather than looking at the relationship between the hospital and its patients, Bhan asks us to look at the relationship between Manteca Hospital and its suppliers of anesthesia services. As Bhan sees it, Manteca Hospital and the physician anesthesia providers conspired to boycott nurse anesthesia providers.
 
 
 26
 Bhan quite correctly argues that Jefferson Parish does not prevent a court from evaluating the facts of this case as a possible illegal boycott of a class of suppliers. Jefferson Parish merely demonstrates that a hospital's exclusive contract with an anesthesia group may be analyzed as a tie-in. It does not say that such an arrangement must be treated as a tying case or that per se boycott analysis could never apply. Thus, the district court erred in ignoring Bhan's per se boycott claim.
 
 
 27
 B. Is the Policy a Boycott Subject To Per Se Condemnation?
 
 
 28
 Boycotts, sometimes called concerted refusals to deal, can exist in a variety of forms. Examples of boycott activity include: 1) two or more firms agreeing not to deal with a competing firm in an industry that requires interaction between competitors, Silver v. New York Stock Exch., 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (exchange brokers agree not to trade with nonexchange brokers); 2) competing firms refusing to deal with certain firms with whom they have a vertical relationship, Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) (dress designers and manufacturers agree not to sell to retailers who continue to deal with "style-pirates"); 3) competing firms engaged in a cooperative venture excluding other competing firms, Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (buying cooperative made up of retailers expels a member).
 
 
 29
 As noted above, only certain boycotts are unlawful per se. Nonetheless, the distinction between boycotts that are and those that must be tested under the rule of reason is less than crystal clear. See Northwest Stationers, 472 U.S. at 294, 105 S.Ct. at 2619. The line can best be drawn, however, by following the analysis used to separate per se and rule of reason cases in general. Thus, the per se rule should be invoked for a group boycott when the challenged activity would almost always tend to be predominantly anti-competitive. See Northwest Stationers, 472 U.S. at 298, 105 S.Ct. at 2621; Rickards v. Canine Eye Registration Found., 783 F.2d 1329, 1333 (9th Cir.1986).
 
 
 30
 The practice of which Bhan complains can be cast in the following general terms: physicians conspiring with a hospital to allow only physician, rather than nonphysician, providers to offer services in a particular area. As a result, the hospital eliminates a class of providers.[6]
 
 
 31
 This activity does not appear to be one that is always anti-competitive.[7] On the one hand, hospitals must make choices about the types of qualifications a practitioner must have to apply for staff privileges in various fields of practice. See Jefferson Parish, 466 U.S. at 30, 104 S.Ct. at 1567 (commenting that hospitals have an unquestioned right to exercise control over staff privileges). These restrictions help it provide more efficient, higher quality service in order to compete against other hospitals. 6 J. von Kalinowski, Antitrust Laws & Trade Regulation Sec. 52.03, at 52-45 (1990). This also reduces its malpractice exposure. Thus, the choice of physician over nonphysician providers may actually sharpen competition by making Manteca a more attractive competitor in the patient market.[8]
 
 
 32
 On the other hand, a plaintiff may be able to establish in a certain situation that the physicians are conspiring to drive the nurses out of business because their services are just as good but cheaper. The hospital may be shown to be acceding to the doctors' wishes because of its wish to retain certain of the doctors' services. In that case, the practice of excluding nonphysician providers as a class would appear to be anti-competitive.
 
 
 33
 In sum, the practice of excluding nonphysicians in favor of physicians is not one that always would have an anti-competitive effect. Given that the effect of the practice is unclear, it is appropriate to apply the rule of reason.
 
 
 34
 C. Is the Restraint Illegal Under the Rule of Reason?
 
 
 35
 It follows that we must examine the practice alleged by the plaintiff under the rule of reason. Under this test, the factfinder must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance. Thurman Indus., Inc. v. Pay'N Pak Stores, Inc., 875 F.2d 1369, 1373 (9th Cir.1989); Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1445 (9th Cir.1988).
 
 
 36
 To meet his initial burden in establishing that the practice is an unreasonable restraint of trade, plaintiff must show that the activity is the type that restrains trade and that the restraint is likely to be of significant magnitude. See P. Areeda, supra, p 1507b, at 397. Ordinarily, a plaintiff to do this must delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly. Id.; see Jefferson Parish, 466 U.S. at 29, 104 S.Ct. at 1567.[9]
 
 
 37
 A full-blown market analysis is not necessary. A lesser analysis may show that the restraint has actually produced significant anti-competitive effects, such as a reduction in output. If the plaintiff can make a showing of anti-competitive effects, a formal market analysis becomes unnecessary. FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2018-19, 90 L.Ed.2d 445 (1986).[10]
 
 
 38
 Should the plaintiff satisfy his initial burden, the defendant must offer evidence of pro-competitive effects. The plaintiff, driven to this point, must then try to show that any legitimate objectives can be achieved in a substantially less restrictive manner. Finally, the court must weigh the harms and benefits to determine if the behavior is reasonable on balance. P. Areeda, supra, p 1502, at 371-72.[11]
 
 
 39
 In this case, Bhan stumbles and fails to clear the first hurdle. He fails to meet his burden of showing that the hospital's policy substantially restrains competition in a relevant market. Market definition requires both a geographic and a product dimension. Bhan claims that the relevant product market is the market in which hospitals compete for anesthesia services and the geographic market is the town of Manteca. Bhan's only evidence of the geographic market is that the hospital wanted its anesthesia providers to live in Manteca.[12] Bhan's difficulty is that the geographic limits of the product market exceed that measured by the town of Manteca. Anesthesia services available to hospitals could easily extend beyond the limits of Manteca. Hospitals may acquire them from hundreds of miles away. The fact that the defendant hospital may wish them to reside in Manteca in no way limits the geographic area from which anesthesia services may be acquired and brought to work in Manteca. Bhan simply has not considered these and other market definition issues. The result is that it cannot be said that the hospital's policy restrains competition in a "relevant market."
 
 
 40
 Bhan also claims that since he has offered proof of actual anti-competitive effects, a formal market analysis is unnecessary. The only actual effect shown is that one nurse anesthetist no longer works at one hospital. This alone is not enough to demonstrate actual detrimental effects on competition.[13]
 
 
 41
 In short, Bhan has failed to meet his initial burden of showing that the hospital's policy substantially restrained competition in a relevant market. Thus, Bhan's claim also fails under a rule of reason analysis.
 
 
 42
 The district court also granted summary judgment for defendants on Bhan's Sec. 2 Sherman Act claims for monopolization and attempted monopolization. In a footnote of his opening brief, Bhan purports to appeal this grant as well; however, he offers no legal analysis or discussion at all. He also alleges a per se illegal market division in the same footnote for which he offers no support. We treat these unargued claims as abandoned. See Movie 1 & 2 v. United Artists Communications, 909 F.2d 1245, 1253-54 (9th Cir.1990).
 
 IV.
 THE DISCOVERY SANCTIONS
 
 43
 One of Bhan's expert witnesses arrived unprepared for a scheduled deposition. The expert had planned to base his conclusions on a report published by a national group, but the report had been temporarily withdrawn to correct an error. After answering a few initial questions, the expert stalked out of the deposition. Bhan's counsel tried unsuccessfully to convince him to stay. Bhan's counsel then offered to reschedule the deposition or to substitute another expert whom they had not planned to present. Defendants objected. The magistrate excluded the expert from trial and awarded $9,364.21 in sanctions for travel, preparation, and attendance costs.
 
 
 44
 A district court may refer pretrial issues to a magistrate under 28 U.S.C. Sec. 636(b)(1) (1988). The statute provides that the magistrate's decision on a nondispositive issue will be reviewed by the district judge under the clearly erroneous standard. United States v. Raddatz, 447 U.S. 667, 673, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980) (describing the difference between dispositive and nondispositive issues in a case concerning dispositive issues); see 28 U.S.C. Sec. 636(b)(1). Decisions on dispositive issues will be reviewed de novo. Raddatz, 447 U.S. at 673, 100 S.Ct. at 2411; 28 U.S.C. Sec. 636. Nondispositive issues include discovery sanctions. Merritt v. International Bhd. of Boilermakers, 649 F.2d 1013, 1018 (5th Cir. Unit A June 1981); 12 C. Wright & A. Miller, Federal Practice & Procedure Sec. 3076.5, at 44 (Supp.1990).
 
 
 45
 A. Is the Statute Unconstitutional?
 
 
 46
 Bhan argues that the portion of the statute providing for clearly erroneous review of nondispositive issues is unconstitutional. He contends that with such a cursory review, Article III judges are permitted to delegate too much power without retaining proper control over the proceeding.
 
 
 47
 Although a number of courts have applied this portion of the magistrate statute in the fourteen years since the statute was passed, no opinion discusses the constitutionality of the section. Two other areas of delegation to magistrates, however, have been decided. First, the statute allows a district court to delegate dispositive issues to a magistrate subject to de novo review. The Supreme Court upheld the constitutionality of this provision on the ground that de novo review provided sufficient oversight. See Raddatz, 447 U.S. at 681-84, 100 S.Ct. at 2415-17. Second, parties in a civil case may agree to have a case decided by a magistrate sitting without a jury. The Ninth Circuit en banc upheld this grant of power, stressing the consensual nature of the referral statute. See Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 725 F.2d 537, 546 (9th Cir.1984) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).
 
 
 48
 Neither of these cases explicitly controls the issue Bhan raises. Nevertheless, the clearly erroneous standard of review is sufficient here to prevent the delegation to a magistrate of the powers to decide a routine discovery matter from constituting an unconstitutional delegation of authority.
 
 
 49
 B. Was the Magistrate's Order Clearly Erroneous?
 
 
 50
 Bhan argues that the award was clearly erroneous given his counsel's efforts to mitigate. However, counsel should be able to produce his witness properly prepared at the time scheduled. The issue of whether counsel acted properly can best be decided by the magistrate who is on the spot. The award is not clearly erroneous.
 
 
 51
 Bhan also objects that he did not have proper notice that he could receive sanctions. He argues that the magistrate's order did not list specific times for depositions, but merely required the parties to work out agreeable times for deposing experts. Moreover, Bhan objects that the magistrate's order was not reduced to writing until after the sanctions were imposed, despite a local rule stating that a magistrate's orders "shall be in writing." See Local Rule 304(a) of the United States District Court for the Eastern District of California.
 
 
 52
 Bhan is incorrect. Discovery sanctions may be imposed for failure to comply with an oral order. Professional Seminar Consultants, Inc. v. Sino Am. Technology Exch. Council, Inc., 727 F.2d 1470, 1474 (9th Cir.1984). Moreover, any counsel should know that producing an unprepared expert is sanctionable.
 
 
 53
 Bhan also objects that the award was excessive. Given that the expert had not produced any reports for defendants to review ahead of time, he argues that defendants must have charged for time incurred for general case preparation rather than specific preparation for this witness. See United States v. National Medical Enters., Inc., 792 F.2d 906, 910 (9th Cir.1986) (compensatory sanctions should be limited to the actual losses sustained). Even without a report to review, however, defendants had to spend time preparing for this witness. Both the magistrate and the lower court have adequately reviewed the defendants' declaration of costs. The award was not clearly erroneous.
 
 
 54
 Finally, defendants ask that this panel award their attorney's fees spent in defending the grant of sanctions. They cite this court's holding in Mickwee v. Hsu that "[w]hen the trial court has imposed sanctions for failure to comply with discovery and the order is appealed, as a general rule attorney's fees should be awarded where the discovery order is upheld." Mickwee v. Hsu, 753 F.2d 770, 770 (9th Cir.1985) (per curiam). Considering that a constitutional issue was raised and herein decided, we will not award any attorney's fees incurred by the defendants in defending the grant of sanctions.
 
 
 55
 AFFIRMED.
 
 
 
 [1]
 Defendants California Society of Anesthesiologists, California League of Anesthesiologists, and Yong Suk have been dismissed from the case. The remaining defendants are: NME Hospitals, Inc., owner and operator of Manteca Hospital; National Medical Enterprises, Inc., the parent company of NME; and John Menaugh, the hospital administrator
 
 
 [2]
 See Bhan, 669 F.Supp. at 1007. Bhan appears to have earned eighty percent of his income as an anesthetist from Manteca Hospital and twenty percent from these other sources. See Appellant's Opening Brief at 11
 
 
 [3]
 The classic formulation appears in the Chicago Board of Trade opinion: "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." Board of Trade of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (Brandeis, J.)
 
 
 [4]
 Areeda describes the test in the following manner:
 First, what harm to competition results or may result from the collaborators' activities? Second, what is the object they are trying to achieve, and is it a legitimate and significant one; that is, what are the nature and magnitude of the "redeeming virtues" of the challenged collaboration? Third, is the restraint reasonably necessary for the achievement of any such legitimate objectives? That is, are there other and better ways--so-called less restrictive alternatives--by which the collaborators can achieve their legitimate objectives with fewer harms to competition?
 
 
 [7]
 P. Areeda, Antitrust Law p 1502, at 371 (1986)
 
 
 [5]
 For a detailed analysis of Manteca's share of the market in which area hospitals competed for patients, see Bhan, 669 F.Supp. at 1018-20
 
 
 [6]
 The hospital will still consider the individual merits of each physician applicant in granting staff privileges. It has simply decided that only physician providers may apply
 
 
 [7]
 Only one case in this circuit concerns a situation similar to Bhan's. See Hahn v. Oregon Physicians' Serv., 868 F.2d 1022 (9th Cir.1988) (summary judgment denied in case in which podiatrists sued a health plan for discrimination against their class of providers in favor of orthopedists). Although the opinion is unclear, the Hahn court appears to have applied the rule of reason. The court there explicitly followed the logic of Barry, a case in which this circuit applied rule of reason analysis to a group boycott case. See id. at 1031 (discussing Barry v. Blue Cross, 805 F.2d 866 (9th Cir.1986)
 In addition, Hahn differs from the case at hand in that 1) Hahn involved a health plan rather than a hospital, perhaps not a material difference, however, and 2) the Hahn defendant went out of its way to state that quality of care could not possibly be an issue in the case, clearly a material difference.
 
 
 [8]
 We are not suggesting the defendants' justification that the doctors are better than the nurses is always true. We are merely saying that before deciding to create a new per se category, we must ask whether there are cases within that category in which a comparison of the harms and benefits to competition would find a balance in favor of benefits. If we see the possibility of a significant body of such cases, the category is inappropriate for per se treatment. See P. Areeda, supra, p 1510c, at 421-24 (explaining why a court must consider potential justifications in defining a new per se category); see also Northwest Stationers, 472 U.S. at 289, 105 S.Ct. at 2616 ("per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anti-competitive"). Under a rule of reason inquiry, the plaintiff can always present evidence that the defendants' assertions of competitive benefits are untrue and disingenuous
 
 
 [9]
 To survive a summary judgment motion by a defendant on this point, a plaintiff must demonstrate that there are disputed material facts on this question. P. Areeda, supra, p 1502, at 371-72
 
 
 [10]
 In other words, one aspect of the market power inquiry is to ask whether the defendant has the power to do what it allegedly wanted to do--that is, whether the defendant can actually influence the market. In Indiana Dentists, the plaintiffs did not need to present an elaborate market analysis to show that the federation dentists had enough power to produce an effect in the market. The dentists had already done it. The plaintiff there showed that the dentists were actually able to produce the effect they wanted by completely preventing insurers from obtaining x-rays in at least two localities in a case in which the markets were essentially local. Thus, the dentists must have had market power in at least two relevant markets, and their actions clearly met the test of "likely to affect competition."
 
 
 [11]
 Some of the Hahn language could be read to suggest a different allocation of the burdens in a rule of reason case. See Hahn, 868 F.2d at 1026, 1031 (discussing burdens under Barnes v. Arden Mayfair, Inc., 759 F.2d 676 (9th Cir.1985)). That language, however, refers to the allocation of burdens for determining whether a conspiracy exists. See Hahn 868 F.2d at 1026 (citing the following line of conspiracy cases: Matsushita, 475 U.S. at 574, 106 S.Ct. at 1348; Barnes, 759 F.2d at 680; ALW, Inc. v. United Air Lines, Inc., 510 F.2d 52, 55 (9th Cir.1975))
 While the existence of a conspiracy was at issue in the Hahn appeal, it is not at issue in this appeal.
 
 
 [12]
 Even this condition is suspect as evidence of the geographic market given that 1) when Bhan worked at Manteca Hospital, he also worked at hospitals in other towns; and 2) doctors at Manteca hospital used doctors based in other towns to cover for them
 
 
 [13]
 The Supreme Court also has suggested that elaborate market analysis may not be necessary in a rule of reason case where there is a "naked" agreement not to compete in terms of price or output. In such a case, the defendant must present some justification based on pro-competitive effects even if the plaintiff has failed to provide adequate market analysis. National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. 85, 109-10, 104 S.Ct. 2948, 2964-65, 82 L.Ed.2d 70 (1984) (concerning restrictions on the output and price of televised college football games); see Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 729-30, 108 S.Ct. 1515, 1522-23, 99 L.Ed.2d 808 (1988) (describing naked restraints); Indiana Dentists, 476 U.S. at 460, 106 S.Ct. at 2018 (same). No such agreement exists in this case