**ADAPTIVE POWER SOLUTIONS, LLC, a California limited liability corporation, Plaintiff–counter–defendant–Appellant,**

v.

**HUGHES MISSILE SYSTEMS COMPANY, a Delaware corporation; Defendant–Appellee,**

**Raytheon Company, a Delaware corporation, Defendant–counter–claimant–Appellee.**

No. 97–55010.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1998.

Decided April 15, 1998.

James K.T. Hunter, Los Angeles, California, for plaintiff-counter-defendant-appellant Adaptive Power.

Rodney J. Stone, David A. Battaglia, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for defendant-appellee Raytheon Company.

Rodney J. Stone, David A. Battaglia, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for defendant counter-claimant-appellee Hughes Missile Systems Co.

Before: BRUNETTI, THOMPSON and T.G. NELSON, Circuit Judges.

## OVERVIEW

THOMPSON, Circuit Judge:

Adaptive Power Solutions, LLC ("APS"), a defense industry subcontractor, sued Hughes Missile Systems Company ("Hughes") and Raytheon Company (collectively the "defendants") for allegedly violating section 1 of the Sherman Act and related state law claims. APS alleged that the defendants joined in a concerted refusal to deal with APS to punish APS for attempting to raise prices, which drove APS out of business. The district court granted summary judgment in favor of the defendants on the Sherman Act claim and dismissed the state law claims without prejudice. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## FACTS

Raytheon and Hughes are the only two firms that manufacture advanced medium

range air to air missiles ("AMRAAMs") for sale to the Department of Defense.

In June 1995, the plaintiff APS acquired all of the assets of Sigmapower, Inc. Prior to that acquisition, Sigmapower had manufactured sophisticated electronic equipment, primarily for use in the defense industry. In particular, Sigmapower had manufactured an internal power supply system known as the "A3" for the AMRAAM missile. At the time that APS bought Sigmapower's assets, Sigmapower supplied A3s to Raytheon. Another electronic subcontractor, Oeco Corporation, supplied A3s to Hughes. There were no other suppliers of A3s.

Even before the Sigmapower acquisition was completed, APS began to negotiate with Raytheon for the sale of A3s. In these negotiations, APS raised its asking price for A3s from the previous price of $2,750 per unit to $3,900 per unit. Raytheon refused to buy A3s from APS at the new price.

APS then tried to sell the A3s to Hughes for $2,758, but Hughes refused to buy them. For the purpose of this summary judgment motion, the defendants do not contest APS's allegation that because Raytheon was "angered at APS's attempt to charge Raytheon an increased price for A3's," Raytheon convinced Hughes to join it in refusing to deal with APS "for the purpose and with the intent of driving APS out of the market for the manufacture of A3's."

When APS could not sell its A3s to either Raytheon or Hughes, APS got out of the A3 business. This occurred in September 1995. Oeco then became the only remaining supplier of A3s. But not for long.

The next month, Raytheon awarded a contract for A3s to Signal Technologies Keltec Corporation ("ST Keltec"), a new entrant in the market for the manufacture and sale of A3s. ST Keltec manufactured sophisticated electronic equipment, primarily for the defense industry.

At about this same time, October 1995, APS sold to SoraPower, Inc., another new entrant in the A3 manufacturing market, the assets needed to manufacture A3s (but did not sell to SoraPower APS's inventory of completed A3s). In March or April 1996, SoraPower tried to get Hughes to sign a contract to buy A3s from it, but Hughes refused.

APS filed this lawsuit against Hughes and Raytheon in April 1996, alleging a violation of section 1 of the Sherman Act and related state law claims. Raytheon later moved for summary judgment, and Hughes joined in that motion. APS opposed the motion and moved for a continuance so it could conduct further discovery. The district court denied APS's motion for a continuance, and granted summary judgment in favor of the defendants on the Sherman Act claim. The court then dismissed without prejudice the state law claims. APS now appeals.

## A. The Raytheon/Hughes Conspiracy

For the purpose of the summary judgment motion, the parties assume that Raytheon and Hughes conspired to drive APS from the business of supplying A3s. APS argues this conspiracy is a group boycott or refusal to deal which is per se unreasonable.

Section 1 of the Sherman Act provides: "Every ... conspiracy, in restraint of trade or commerce among the several States, ... is hereby declared to be illegal." 15 U.S.C. § 1 (1994). A restraint of trade is per se unreasonable, when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 100, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984) (citation omitted). If a court finds that a restraint is not per se unreasonable, it analyzes the restraint under the rule of reason to determine "whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986) (citation omitted).

The Supreme Court has applied the per se approach to cases that "have generally involved joint efforts by a firm or firms *to disadvantage competitors* ...." *Northwest Wholesale Stationers, Inc. v. Pacific Station-*

*ery & Printing Co.,* 472 U.S. 284, 293–94, 105 S.Ct. 2613, 2619, 86 L.Ed.2d 202 (1985) (emphasis added). Three characteristics are indicative of a per se illegal boycott:

> (1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition.

*Hahn v. Oregon Physicians' Serv.,* 868 F.2d 1022, 1030 (9th Cir.1988) (summarizing *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 294, 105 S.Ct. at 2619–20). Absent such a showing, "the category of activities comprising group boycotts 'is not to be expanded indiscriminately.'" *Id.* (quoting *Indiana Fed'n of Dentists,* 476 U.S. at 458, 106 S.Ct. at 2017–18).

■ Framing its argument to fit within the *Hahn* formulation, APS argues that the defendants' conspiracy was per se illegal because (1) it cut off APS's access to the market for the sale of A3s; (2) the defendants are the only manufacturers of AMRAAMs so, not only are they the dominant market, they are the only market for the sale of A3s; and (3) the defendants have failed to state a plausible argument that their conspiracy enhanced competition.

This argument overlooks the Court's description of a group boycott as one which "disadvantages competitors." *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 294, 105 S.Ct. at 2619–20. "[T]he per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers *in order to discourage them from doing business with a competitor.*" *Indiana Fed'n of Dentists,* 476 U.S. at 458, 106 S.Ct. at 2018 (emphasis added). Raytheon and Hughes were competitors, but there were no other competitors in the AMRAAM market. Their alleged conspiracy did not disadvantage a competitor; thus, their boycott does not fit the per se category.

Seizing upon the word "generally" in *Northwest* and *Indiana Fed'n of Dentists,* APS argues the present case is the exception to the *Northwest* formulation of a per se group boycott as "generally involv[ing] joint efforts by a firm or firms to disadvantage competitors." *Northwest,* 472 U.S. at 294, 105 S.Ct. at 2619. In support of this argument, APS relies on *Fashion Originators' Guild of America v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). This reliance is misplaced.

In *Fashion Originators',* dress and textile manufacturers who sold original designs agreed to boycott retailers that dealt with manufacturers who sold copies of those original designs. Even though the manufacturers boycotted retailers, with whom they had a vertical relationship, the purpose of the boycott was to injure competitors, those manufacturers who sold copies. *Id.* at 467, 61 S.Ct. at 708 ("the aim of petitioners' combination was the intentional destruction of one type of manufacture and sale which competed with Guild members"). In sum, *Fashion Originators'* involved manufacturers who agreed to a group boycott of retailers to disadvantage competing manufacturers. It was precisely the kind of boycott described in *Northwest.* It is not the kind of boycott asserted here.

■ APS also argues the Raytheon/Hughes boycott is a price-fixing conspiracy, because Raytheon and Hughes conspired to boycott APS to drive it from the A3 market as punishment for attempting to raise its price for A3s. The defect in this argument is a factual one. This is not a case in which competitors try to fix their prices. This is a case in which manufacturers refuse to deal with a high-priced supplier. This has nothing to do with a price-fixing conspiracy among competitors who agree among themselves to fix their prices.

We conclude the Raytheon/Hughes conspiracy did not trigger the per se rule of a group boycott. The district court properly chose to apply the rule of reason.

**B. Rule of Reason**

■ Under the rule of reason, to decide whether a challenged restraint is unreasonable under the Sherman Act, "[t]he focus is on actual effects that the challenged restraint has had on competition in a relevant market." *Bhan v. NME Hospitals, Inc.,* 929

F.2d 1404, 1410 (9th Cir.1991). APS argues it has shown injury to competition by establishing the defendants' market power and by showing actual injury, either one of which, it contends, is sufficient. We disagree.

### 1. Market Power

■ "Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market *and to show the effects of competition within that market.*" *See, e.g., American Ad Management, Inc. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir.1996) (emphases added) (quoting *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1446 (9th Cir.1988) (which cites numerous Ninth Circuit cases for support)). In *American Ad Management*, we required not only a definition of the market, but also a showing that the business practice injured competition by increasing the prices consumers paid in that market. *American Ad Management*, 92 F.3d at 790.

The *American Ad Management* principle is applicable to this case. APS must not only establish that the defendants had market power, it must also establish that the defendants' boycott injured competition. There is no question Raytheon and Hughes had market power. We consider, therefore, whether their boycott injured competition.

### 2. Injury to Competition

■ Antitrust laws are designed to protect competition, not competitors. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S.Ct. 1884, 1891, 109 L.Ed.2d 333 (1990). "[T]he alleged injury must be caused by a reduction, rather than an increase, in competition resulting from the restraint." *Theee Movies of Tarzana v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1400 (9th Cir.1987).

■ The parties disagree as to whether, as a result of the Raytheon/Hughes refusal to deal with APS, the number of competitors for the manufacture and sale of A3s increased, remained the same, or decreased due to a temporary decline. Their disagreement stems from their differing definitions of "competitors."

APS defines a competitor as a qualified manufacturer of A3s; to become qualified, Hughes or Raytheon must review the capability of a manufacturer and approve the manufacturer as a source from which Hughes or Raytheon would buy A3s. In contrast, Hughes and Raytheon define a competitor as a manufacturer that has the equipment to produce A3s and indicates an interest in manufacturing and selling them.

Under either definition, prior to June 1995 there were two competitors, Oeco and APS's predecessor, Sigmapower. There are now at least two competitors, Oeco and ST Keltec, and there may be three if SoraPower is included in the count. In determining the count, the relevant chronology of A3 manufacturers entering, leaving and remaining in the market is significant.

The relevant chronology. is as follows: In June 1995, APS bought Sigmapower's assets and labelled itself a competitor. So, according to APS, there continued to be two competitors: APS and Oeco. In September 1995, APS "was driven" out of the A3 manufacturing market and sold its A3 production equipment to SoraPower. The next month, October 1995, Hughes awarded ST Keltec, a new entrant into the market, a contract to produce A3s. ST Keltec actually began producing A3s sometime later in 1995. It is not clear from the evidence exactly when ST Keltec became "qualified."

The other new entrant, SoraPower, approached Hughes in March or April of 1996 to try to obtain a contract to supply Hughes with A3s, but was not successful. Oeco continued to manufacture and sell A3s all along.

The defendants argue that competition was actually increased because in place of the original two competitors, three emerged: Oeco, ST Keltec and SoraPower. As the defendants point out, APS asserts that it immediately became a competitor when it bought Sigmapower's "technology, equipment and inventory." SoraPower later bought APS's equipment, although not its inventory. It may be that if APS immediately became a competitor, so did SoraPower.

But, even if SoraPower did not become an immediate competitor, there was no injury to

competition. ST Keltec became qualified or operational within four to ten months after APS left the market, and Oeco continued to supply A3s all along. To constitute an injury to competition, the restraint must be "of significant magnitude," *Bhan,* 929 F.2d at 1413, and "more than trivial." *Gough v. Rossmoor Corp.,* 585 F.2d 381, 389 (9th Cir. 1978). Here it was not.

The extent of the restraint can be compared to the magnitude of the restraint we considered in a recent section 2 monopolization case. There, in the context of an alleged section 2 Sherman Act violation for monopolization, we "insist[ed] on a preliminary showing of significant and *more-than-temporary* harmful effects on competition." *American Prof'l Testing Svc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.,* 108 F.3d 1147, 1151 (9th Cir.1997) (internal quotation and citation omitted) (emphasis added). Any harmful effect on competition in the present case was, at most, temporary.

A temporary decline in competition was considered by the District of Columbia Circuit in *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 251 (D.C.Cir.1987). There, the court found that a supplier of wax figures did not have a monopoly when the only other supplier could not deliver the product for one year.

APS argues that a four— to ten-month lag in production of A3s is more serious than a one-year lag in wax figure production because the United States government needs completed missiles in order to be prepared to fight a war. This may be, but APS has shown at most only a temporary decline in the number of competitors, a decline which is not significant enough to be classified as an injury to competition under the Sherman Act. *See Id.*

APS also argues that it can establish antitrust injury by showing other anticompetitive effects, such as a reduction in output and quality. *Les Shockley Racing, Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 508–09 (9th Cir.1989) (in a market which "is both narrow and discrete and the market participants are few," the loss of a competitor may injure competition if there is an effect on price or availability, the allocation of re-sources, or the opportunities for market entry). We reject this argument in the context of this case. Just as a temporary decline in the number of competitors is not a significant restraint of trade, neither is a related temporary decline in quantity, quality, or efficiency.

## C. Economic Sense

 Antitrust claims must make economic sense. *Eastman Kodak Co. v. Image Technical Servs. Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 2082–83, 119 L.Ed.2d 265 (1992). Here, the district court found APS's claim of antitrust injury to be "counter-intuitive." The district court characterized the situation as one in which the two consumers of A3s conspired to punish APS by creating, at least temporarily, monopoly power in the remaining supplier. *See also Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.,* 833 F.2d 208, 211 (9th Cir.1987) (it would be "illogical" for a large firm to restrict competition in a market for services which the large firm requires).

APS contends that even though the Raytheon/Hughes boycott of APS may appear at first glance to make no economic sense, it does in fact make economic sense in the long run. APS relies on a statement we have made concerning predatory pricing: "A long-run strategy requires the predator to drive rivals from the market, or *discipline them sufficiently so that they do not act as competitors normally should." Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1433–34 (9th Cir.1995) (emphasis added). Of course, APS was not a competitor of Raytheon or Hughes, so they gained nothing by driving APS from the market, except perhaps the satisfaction of having done so.

APS, however, characterizes the Raytheon/Hughes conspiracy as a conspiracy to injure competition in the A3 manufacturing market. According to APS, Hughes and Raytheon were willing to accept some short-term discomfort in order to discipline their suppliers to insure continued low prices. APS asserts that small subcontractors in the defense industry are dependent upon large defense firms. These subcontractors are careful to charge low prices in order to keep

the large defense firms happy. Because new entrant APS was unaware of how things worked in the industry, it attempted to raise its price. Rather than merely refusing to pay the higher price, the larger firms chose to make an example by punishing APS, in order to "discipline" the remaining defense industry suppliers into charging low prices, some even below cost.

APS's argument misconstrues the uncontroverted evidence. APS presented no evidence whatsoever that Raytheon and Hughes boycotted APS to punish other subcontractors. To the contrary, the evidence establishes without contradiction that Raytheon and Hughes boycotted APS to punish it. The evidence is also uncontroverted that this did not injure competition, even if we accept APS's contention that there was only one A3 manufacturer supplying A3s for a matter of months after APS quit the business.

The district court got it right. APS's argument makes no economic sense and there was no relevant evidence to support it anyway.

D. Rule 56(f) Motion

As part of its opposition to Raytheon's summary judgment motion, APS requested a continuance under Federal Rule of Civil Procedure 56(f) so it could conduct further discovery. The district court denied APS's request.

The district court did not abuse its discretion. *See Qualls ex rel. Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir.1994). The discovery APS sought would not have precluded summary judgment. *See id.* (district court does not abuse its discretion when the additional discovery would not have precluded summary judgment).

AFFIRMED.