170 F.3d 897
 160 L.R.R.M. (BNA) 2769, 137 Lab.Cas. P 10,386,
1999-1 Trade Cases P 72,480,
99 Cal. Daily Op. Serv. 1879,
1999 Daily Journal D.A.R. 2429
 BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY; Santa Fe
Railway Company, Plaintiffs-Appellees,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 174, an
unincorporated association; Robert A. Hasegawa,
an individual; Eric Smith, Defendants-Appellants.
 No. 97-35859.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1998.
Decided March 16, 1999.
 
 1
 Dimitri Iglitzin, Schwerin Campbell Barnard LLP, Seattle, Washington, for the defendants-appellants.
 
 
 2
 Roy T. Englert, Mayer, Brown & Platt, Washington, D.C., for the plaintiffs-appellees.
 
 
 3
 Donald Munro, Shea & Gardner, Washington, DC, for amicus.
 
 
 4
 Appeal from the United States District Court for the Western District of Washington; Walter T. McGovern, District Judge, Presiding. D.C. No. CV-97-01052-WTM.
 
 
 5
 Before: THOMPSON, TASHIMA, Circuit Judges, and STAGG, District Judge.*
 
 
 6
 Opinion by Judge STAGG; Dissent by Judge TASHIMA.
 
 STAGG, District Judge:
 
 7
 Union sought to compel railroad, by threat of picketing, to enter into agreement whereby railroad would be bound to subcontract only with employers who had existing collective-bargaining relationships with union. Railroad resisted, filed an unfair labor practices charge with the National Labor Relations Board ("NLRB"), and filed suit in the Western District of Washington, seeking to preliminarily and permanently enjoin union under the federal antitrust laws, 15 U.S.C. § 1 et seq., and the Railway Labor Act, 45 U.S.C. § 151 et seq. ("RLA"). After a hearing, the district court granted the preliminary injunction, and the union appealed pursuant to 28 U.S.C. § 1292(a)(1). We affirm.
 
 I. BACKGROUND
 
 8
 The Burlington Northern and Santa Fe Railway Company ("Burlington Northern") is an interstate rail common carrier with operations in 28 states. Burlington Northern operates two major intermodal facilities in the Seattle, Washington area: the Puget Sound Hub or "South Seattle" hub, which handles domestic traffic, and the Seattle International Gateway or SIG, which handles international traffic. A combined average of 1,200 intermodal containers are loaded and unloaded at these two hubs each day by subcontractors hired by Burlington Northern.
 
 
 9
 Eagle Systems, Inc. ("Eagle Systems"), had a contract with Burlington Northern to perform loading and unloading services at its South Seattle hub. In the Spring of 1997, Burlington Northern informed Eagle Systems that it intended to terminate said contract as of June 9, 1997. Thereafter, Burlington Northern entered into a contract with another company, Parsec, Inc. ("Parsec"), to perform the loading and unloading work at its South Seattle facility. As a result of this action, approximately 53 Eagle System employees lost their jobs. The employees of Eagle System are represented by the International Brotherhood of Teamsters Local 174 ("Local 174"). The employees of Parsec are represented by a union that is not affiliated with the Teamsters. Burlington Northern has never had a collective-bargaining agreement with Local 174, and the union has not invoked any procedures to obtain representational rights with the railroad.
 
 
 10
 On June 17, 1997, Burlington Northern received a letter from Local 174 which provided in pertinent part:
 
 
 11
 It has come to our attention that [Burlington Northern] at times in the past has chosen to subcontract ramp and deramp work located within the geographical jurisdiction of [Local 174] to employers who have themselves as of the time of the subcontract not entered into a collective bargaining agreement with Local 174 or otherwise committed themselves to employ Local 174 members to perform the work covered by the subcontract....
 
 
 12
 ....
 
 
 13
 Local 174 understands that [Burlington Northern] may have existing contracts with such subcontractors, and Local 174 does not in any way request or desire that [Burlington Northern] terminate any such contracts, cease using, selling, handling, transporting, or otherwise dealing in the products of any such contractor, or cease or modify in any way the business relationship [Burlington Northern] has with any such contractor or any other person. Nor does Local 174 wish [Burlington Northern] to encourage, induce, force or require any such contractor or any other person to recognize or bargain with Local 174 or any other labor organization.
 
 
 14
 Local 174 does, however, wish to obtain a commitment from [Burlington Northern], that in the future, [Burlington Northern] will refrain from entering into contractual relationships with any subcontractor who does not at the that time have a current agreement with Local 174....
 
 
 15
 Local 174 hopes that [Burlington Northern] will voluntarily comply with this request and execute an agreement with Local 174 providing that, in the future, [Burlington Northern] will refrain from entering into contractual relationships with any subcontractor who does not at the time have a current agreement with Local 174 such that Local 174 members will be employed by them to perform any ramp, deramp, drayage, warehouse, breakbulk, container freight station, or any other type of work within the jurisdiction of Local 174 to be performed by the subcontractor for [Burlington Northern] within Local 174's jurisdiction, and further providing that payments will be paid to the Western Conference of Teamsters Pension Trust on behalf of the subcontractor's employees....
 
 
 16
 If [Burlington Northern] does not respond to Local 174's satisfaction regarding this matter, Local 174 may commence picketing at our discretion any time after 12:01 midnight on June 30, 1997, at [Burlington Northern's] South Seattle Hub and/or at the site of other [Burlington Northern] facilities and operations, and may at our discretion continue picketing thereafter in support of Local 174's demand that [Burlington Northern] execute with Local 174 the agreement just described.
 
 
 17
 Appellants' Excerpts of Record at 5-6. In response to this letter, Burlington Northern filed an unfair labor practices charge with the NLRB on June 24, 1997. The NLRB referred the charge to its Division of Advice and ultimately dismissed Burlington Northern's claim. See Brief of Appellants, App. A. This decision is currently on appeal to the NLRB's Office of Appeals.
 
 
 18
 In addition to filing a charge with the NLRB, Burlington Northern filed a complaint in the Western District of Washington against Local 174 and two of its officers, Robert Hasegawa, and Eric Smith (hereinafter collectively referred to as "Local 174"), alleging violations of the RLA and the federal antitrust laws and seeking to enjoin Local 174, preliminarily and permanently, from engaging in any unlawful strike, picketing, or work stoppage at any of its facilities. On June 26, 1997, Burlington Northern moved the court for a temporary restraining order, and at a June 30, 1997 hearing on the motion, Local 174 stipulated to the court that it would maintain the status quo, i.e., refrain from picketing, pending the disposition of the railroad's motion for a preliminary injunction.
 
 
 19
 Following an August 8, 1997 hearing, the district court entered an Order granting Burlington Northern's motion for a preliminary injunction.[1] The district court found that as the case did not involve a labor dispute, neither the RLA nor the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., applied.[2] Furthermore, the court found that under the circumstances, a preliminary injunction was warranted (1) because the unions's threatened action against Burlington Northern had the potential to cause irreparable harm to the railroad and (2) because it was substantially likely that the object of said action (i.e., the proposed agreement) was violative of the federal antitrust laws. Local 174 appeals from this interlocutory order pursuant to 28 U.S.C. § 1292(a)(1).
 
 
 20
 Local 174 contends that the district court erred by granting Burlington Northern's motion for a preliminary injunction. Specifically, Local 174 argues:
 
 
 21
 (1) that regardless of the merits of Burlington Northern's antitrust claim, because the dispute between the parties "involves or grows out of a labor dispute," the Norris-LaGuardia Act deprived the district court of the jurisdiction to issue a preliminary injunction against it;
 
 
 22
 (2) that because its activities are protected by the "nonstatutory exemption" from the federal antitrust laws, the district court could not have concluded that Burlington Northern was likely to succeed on the merits of the antitrust claim;
 
 
 23
 (3) that, even aside from the aforementioned issues, Burlington Northern cannot possibly succeed on the merits of the antitrust claim; and
 
 
 24
 (4) that because Burlington Northern voluntarily submitted this action to the jurisdiction of the NLRB, the district court should have deferred to that agency's primary or exclusive jurisdiction.
 
 
 25
 Burlington Northern maintains that the district court did not abuse its discretion in relying on the federal antitrust laws to enjoin Local 174 from picketing its facilities. Specifically, Burlington Northern argues (1) that the district court had jurisdiction to issue a preliminary injunction because the dispute between it and Local 174 arose outside of a labor dispute and (2) that the district court correctly concluded that it had a substantial likelihood of success on its antitrust claim against the union. Alternatively, Burlington Northern contends that, even if the court finds that the instant dispute involves a labor dispute within the meaning of the Norris-LaGuardia Act, the preliminary injunction should, nonetheless, be affirmed because Local 174's threatened actions violate the RLA's comprehensive scheme for resolving labor disputes in the railway industry. Finally, Burlington Northern submits that this matter is not subject to the primary or exclusive jurisdiction of the NLRB.
 
 II. ANALYSIS
 
 26
 A. Standard Of Review.
 
 
 27
 "A district court's order granting preliminary injunctive relief is subject to limited review: It will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." Triad Systems Corp. v. Southeastern Express Co., 64 F.3d 1330, 1334 (9th Cir.1995), cert. denied, 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 96 (1996).
 
 
 28
 B. The Evolution Of The Federal Antitrust And Labor Laws: "Labor Disputes," "Secondary Union Activity," And "Hot Cargo" Agreements.
 
 
 29
 To fully appreciate the instant controversy it is necessary to consider the following interlacing statutes and the historical context in which they arose: the Sherman Antitrust Act, the Clayton Act, the Norris-LaGuardia Act, the National Labor Relations (Wagner) Act, the Labor Management Relations (Taft-Hartley) Act, and the Labor-Management Reporting and Disclosure (Landrum-Griffin) Act. With each of these landmark enactments, Congress has struggled to strike a balance between two declared policies. On the one hand, Congress has sought to "preserve a competitive business economy" based on market principles, and on the other hand, Congress has sought to "preserve the rights of labor to organize to better its conditions through the agency of collective bargaining." Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1945).
 
 
 30
 The rise of monopolies and other anticompetitive business combinations in the latter half of the nineteenth century led to the enactment of the Sherman Antitrust Act in 1890, ch. 647, 26 Stat. 209 (codified as amended at 15 U.S.C. §§ 1-7). Sections 1 and 2 of the Act, 15 U.S.C. §§ 1-2, provide in pertinent part:
 
 
 31
 Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal....
 
 
 32
 Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....
 
 
 33
 As first enacted, the Sherman Antitrust Act did not expressly exempt labor unions from its coverage, and "sharp controversy" arose as to whether the Act applied to unions. Allen Bradley Co., 325 U.S. at 801, 65 S.Ct. at 1536. Anti-labor forces contended that the "[a]ntitrust laws designed to regulate trading were unsuitable to regular employer-employee relations and controversies." Id. at 802, 65 S.Ct. at 1536. The contrary view was that the Act "covered all classes of people and all types of combinations, including unions, if their activities even physically interrupted the free flow of trade or tended to create business monopolies, and that a combination of laborers to obtain a raise in wages was itself a prohibited monopoly." Id. Federal courts adopted the latter interpretation of the Act, applying the antitrust laws to enjoin union activity in a number of cases. See, e.g., Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908); Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911).
 
 
 34
 As organized labor gained political clout in the period between 1890 and 1914, Congress was under increasing pressure to enact legislation excluding the activities of labor unions from the scope of the Sherman Antitrust Act. In response to labor's complaints, Congress passed the Clayton Act in 1914, ch. 323, 38 Stat. 730 (codified as amended at 15 U.S.C. §§ 12-27 and 29 U.S.C. §§ 52-53). Section 6 of the Act, 15 U.S.C. § 17, declares that "labor is not a commodity nor an article of commerce, and that the Sherman Act should not be 'construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help.' " Allen Bradley Co., 325 U.S. at 805, 65 S.Ct. at 1538 (quoting section 6). Section 20 of the Act, 29 U.S.C. § 52, further "limit[s] the power of the courts to issue injunctions in a case 'involving, or growing out of, a [labor] dispute [over] the terms or conditions of employment.' " Id. (quoting section 20).
 
 
 35
 Although "broadly proclaimed as labor's 'Magna Carta,' " the Supreme Court declined to interpret the Clayton Act as wholly exempting labor unions from antitrust liability. Id. See Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921); Bedford Cut Stone Co. v. Journeymen Stone Cutters' Association, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916 (1927). In those cases, labor unions had boycotted certain dealers, with whom the unions' members were not employed, because those dealers were selling goods produced by employers with whom the unions had existing controversies over the terms and conditions of employment. In both cases, the Court held that
 
 
 36
 the Clayton Act exempted labor union activities [from the scope of the Sherman Antitrust Act] only insofar as those activities were directed against the employees' immediate employers and that controversies over the sale of goods by other dealers [e.g., secondary boycotts] did not constitute "labor disputes" within the meaning of the Clayton Act.
 
 
 37
 Allen Bradley Co., 325 U.S. at 805, 65 S.Ct. at 1538. As a result of these decisions, the Court established that " 'primary' but not 'secondary' pressures were excepted from the antitrust laws" by the Clayton Act.[3] National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 622, 87 S.Ct. 1250, 1256, 18 L.Ed.2d 357 (1967). Unsatisfied with the narrow construction given to the Clayton Act by the Court, the unions again petitioned Congress for additional protection from the antitrust laws.
 
 
 38
 In response to labor's protests and to escape the effect of the Duplex Printing Press Co. and Bedford Cut Stone Co. decisions, Congress enacted the Norris-LaGuardia Act in 1932, ch. 90, 47 Stat. 70 (codified as amended at 29 U.S.C. §§ 101-15).[4] See New Negro Alliance, et al. v. Sanitary Grocery Co., 303 U.S. 552, 562, 58 S.Ct. 703, 707, 82 L.Ed. 1012 (1938)("The legislative history of the [Norris LaGuardia Act] demonstrates that it was the purpose of the Congress further to extend the prohibitions of the Clayton Act respecting the exercise of jurisdiction of the federal courts and to obviate the results of the judicial construction of that act"). With the Clayton Act, "Congress abolished, for purposes of labor immunity, the distinction between primary activity between the immediate disputants and secondary activity in which the employer disputants and the members of the union do not stand in the proximate relation of employer and employee." National Woodwork Manufacturers Association, 386 U.S. at 623, 87 S.Ct. at 1257 (quotations and citations omitted). Accordingly, the "allowable area of union activity" was dramatically expanded by the Norris-LaGuardia Act. Id.
 
 
 39
 Further amplifying its hospitality toward labor organizations, Congress passed the National Labor Relations (Wagner) Act in 1935, ch. 372, 49 Stat. 449 (codified as amended at 29 U.S.C. § 151 et seq.). The Wagner Act implemented a comprehensive federal regulatory code governing labor relations; guaranteed employees the basic right to collectively bargain with their employers through representatives of their own choosing; preserved the right of employees to strike; prohibited certain "unfair labor practices"; and established the NLRB to oversee this new regulatory scheme.[5] See Polish National Alliance v. N.L.R.B., 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944)("Congress, by this subchapter, in order to protect interstate commerce from adverse affects of labor disputes has undertaken to regulate all conduct having such consequences that constitutionally it can regulate").
 
 
 40
 Recognizing that Congress in the Norris-LaGuardia and Wagner Acts had finally accepted the arguments made by pro-labor forces opposing the application of the Sherman Antitrust Act to unions, the Supreme Court-first in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), and then in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941)-held that the Sherman, Clayton, Norris-LaGuardia, and Wagner Acts "must be jointly considered in arriving at a conclusion as to whether labor union activities run counter to the Antitrust legislation." Allen Bradley Co., 325 U.S. at 806, 65 S.Ct. at 1538. In other words, the Court explained that conduct otherwise permitted by the labor laws could not be declared by the federal courts to be a violation of the Sherman Antitrust Act.
 
 
 41
 For 15 years following the passage of the Norris-LaGuardia Act, unions were able to bring economic pressure against neutral, secondary employers with impunity under both the federal labor and antitrust laws. In 1947, however, labor's abuse of this broad immunity resulted in Congress' passage of the Labor Management Relations (Taft-Hartley) Act, ch. 120, 61 Stat. 136 (codified as amended at 29 U.S.C. §§ 141-44 and at various other sections of title 29). Among other things, the Taft-Hartley Act added section 8(b)(4)(A) to the Wagner Act, prohibiting most secondary union activity. As originally enacted, this section made it an unlawful labor practice for a labor organization or its agents
 
 
 42
 to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer or to cease doing business with any other person.
 
 61 Stat. 141. Senator Taft explained:
 
 43
 This provision makes it unlawful to resort to secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees.... [U]nder the provisions of the Norris-LaGuardia Act, it became impossible to stop a secondary boycott or any other kind of a strike, no matter how unlawful it may have been at common law. All this provision of the bill does is to reverse the effect of the law as to secondary boycotts.
 
 
 44
 National Woodwork Manufacturers Association, 386 U.S. at 624, 87 S.Ct. at 1257 (quoting 93 Cong. Rec. 4198, II Legislative History of the Labor Management Relations Act, 1947, 1106). See also id. at 635, 87 S.Ct. at 1263 (providing that Congress' purpose in enacting section 8(b)(4)(A) was "to protect genuinely neutral employers and their employees, not themselves involved in a labor dispute, against economic coercion designed to give a labor union victory in a dispute with some other employer"). Section 8(b)(4)(A)'s proscriptions against secondary activity were made enforceable by both the NLRB (which is authorized by 29 U.S.C. § 160 to seek injunctions against unfair labor practices) and by private parties under section 303 of the Taft-Hartley Act.[6] By enacting section 8(b)(4)(A), Congress had effectively returned to the regime of Duplex Printing Press Co. and Bedford Cut Stone Co., wherein secondary union activity is both unsanctioned by the labor laws and enjoinable.[7]
 
 
 45
 As a result of certain loopholes in the statutory scheme exposed by various NLRB and court decisions in the period following the passage of the Taft-Hartley Act, Congress enacted the Labor-Management Reporting and Disclosure (Landrum-Griffin) Act in 1959, Pub.L. No. 86-257, 73 Stat. 542 (codified as amended at various sections of title 29, United States Code). Among the many changes effected by the Act was the addition of section 8(e) to the Wagner Act. This section provides in part:
 
 
 46
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such an extent unenforceable and void....
 
 
 47
 29 U.S.C. § 158(e). Section 8(e) was enacted by Congress to close the loophole created by Local 1976, United Brotherhood of Carpenters and Joiners v. N.L.R.B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). In Carpenters, the Court held that section 8(b)(4)(A) of the Wagner Act did not prohibit an employer and a union with which the employer does not have an existing collective-bargaining agreement to voluntarily enter into an agreement whereby the employer agrees not to handle nonunion material. The holding in Carpenters, thus, permitted unions to circumvent section 8(b)(4)(A)'s broad prohibition against secondary activity by entering into "hot cargo" agreements with neutral employer.[8] Section 8(e), in effect, plugged this gap in the legislation by making "hot cargo" agreements unlawful per se. See National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 634-35, 87 S.Ct. 1250, 1262-63, 18 L.Ed.2d 357 (1967). To provide for the enforcement of section 8(e), the Landrum-Griffin Act amended section 8(b)(4)[9] itself as well as section 303 of the Taft-Hartley Act.[10] Although the language of section 8(e) appears to broadly proscribe all agreements whereby an "employer ... agrees to cease or refrain ... from dealing in any of the products of any other employer," the Court has held that, in light of its legislative history, section 8(e) only applies to agreements entered into between a union and a neutral employer, i.e., agreements that are intended to bring secondary pressure to bear upon a primary employer with which the union has an existing dispute over the terms and conditions of its members' employment. See id.
 
 
 48
 With this complex statutory framework in mind, we turn to the instant controversy. First, we must determine whether the court a quo had jurisdiction to enter the preliminary injunction in question. As part of this inquiry, we must decide (1) whether the conflict between Local 174 and Burlington Northern involves a "labor dispute" within the meaning of the Norris-LaGuardia Act and, thus, whether that Act's anti-injunction provisions are applicable[11] and (2) whether the "non-statutory exemption" from the federal antitrust laws applies. Second, assuming the district court had jurisdiction, we must determine whether the district court abused its discretion in preliminarily enjoining Local 174 under the federal antitrust laws.
 
 
 49
 C. The District Court Had Jurisdiction To Enter A Preliminary Injunction Against Local 174.
 
 
 50
 1. The Dispute Between Local 174 And Burlington Northern Does Not Involve A "Labor Dispute" Within The Meaning Of The Norris-LaGuardia Act And, Therefore, That Act's Anti-Injunction Provisions Are Inapplicable.
 
 
 51
 In its August 13, 1997 order granting Burlington Northern's motion for a preliminary injunction, the district court found that the dispute between Burlington Northern and Local 174 did not concern "rates of pay, rules, or working conditions" or "the association or representation of persons negotiating the terms or conditions of employment" and, thus, was not a "labor dispute" within the meaning of the Norris-LaGuardia Act. See Appellants' Excerpt of Record at 17. As no labor dispute was involved, the district court ruled that the Norris-LaGuardia Act was inapplicable and did not present a jurisdictional bar to its enjoining Local 174's threatened picketing of the railroad as a likely violation of the federal antitrust laws. On appeal, Local 174 contends that the district court erred by concluding that the dispute between it and Burlington Northern did not involve or grow out of a labor dispute and, therefore, that it did not fall within the ambit of the Norris-LaGuardia Act.
 
 
 52
 As established above, the Norris-LaGuardia Act's jurisdictional bar is applicable only if a case "involv[es] or grow[s] out of a labor dispute." Section 13(c) of the Act, 29 U.S.C. § 113(c), specifically defines the term "labor dispute" as
 
 
 53
 any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
 
 
 54
 The Supreme Court has stated that the term "labor dispute" as used in the Norris-LaGuardia Act is to be broadly and liberally construed. See, e.g., Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, 457 U.S. 702, 712, 102 S.Ct. 2672, 2680, 73 L.Ed.2d 327 (1982). However, just because a dispute involves a labor union does not necessarily mean that it is a "labor dispute" within the meaning of the Act. Id.
 
 
 55
 In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938), one of the earliest Supreme Court decisions to address the scope of the Norris-LaGuardia Act, the Court expansively interpreted the term "labor dispute" to include a dispute between a civil rights organization and a grocer over the latter's reluctance to hire black employees. Although no employer-employee relationship existed between any member of the organization and the grocer and although the organization was not seeking to establish a collective-bargaining relationship with the grocer or with any other employer, the court found that a labor dispute existed and, therefore, held that the Norris-LaGuardia Act deprived the lower court of jurisdiction to issue an injunction against the organization's picketing of the grocer. Id. at 560-63, 58 S.Ct. at 706-08.
 
 
 56
 Two years later, in Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), the Court continued its trend of liberally interpreting the Norris-LaGuardia Act. In Milk Wagon Drivers' Union, a union composed of milk deliverymen who worked for certain Chicago-area dairies had begun picketing retail stores, with whom they had no employment relationship, protesting those stores' decision to sell milk obtained from non-unionized dairies at "cut-rate" prices. When an organization representing the non-unionized dairies sought an injunction against the deliverymen's union for violating the Sherman Antitrust and Clayton Acts, the district court dismissed the suit for lack of jurisdiction citing the Norris-LaGuardia Act. The Supreme Court affirmed the district court decision, stating:
 
 
 57
 [I]n the language of the Norris-LaGuardia Act, ... the case arose out of and involved a labor dispute between one or more employers or associations of employers and one or more employees or associations of employees', all of whom were engaged in the same industry, trade, craft, or occupation, namely, the milk industry; that defendants had attempted for some time to unionize the employees of the plaintiff dairies and other cut-rate dairies, and that the picketing was an effort on the part of the defendant to compel the vendors and wagon drivers of the dairies to join the defendant union for the purpose of improving working conditions and wages of vendors.
 
 
 58
 Id. at 97, 61 S.Ct. at 125.
 
 
 59
 In the 1940's, the Court began to narrow the application of the Norris-LaGuardia Act. For example, in Columbia River Packers Association v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942), the Court held that a union representing independent fishermen could be restrained under the Sherman Antitrust Act from requiring certain fish processing companies to agree, as a condition precedent to the purchase of fish from its members, not to purchase fish from non-members of the union. The court explained that the Norris-LaGuardia Act was inapplicable because the controversy between the parties did not involve a "labor dispute":
 
 
 60
 That a dispute among businessmen over the terms of a contract for the sale of fish is something different from a "controversy concerning the terms or conditions of employment, or concerning the association ... of persons ... seeking to arrange terms or conditions of employment" ... calls for no extended discussion. This definition and the stated public policy of the Act-aid to "the individual unorganized worker ... commonly helpless ... to obtain acceptable terms and conditions of employment" and protection of the worker "from the interference, restraint, or coercion of employers of labor" ...--makes it clear that the attention of Congress was focused upon disputes affecting the employer-employee relationship, and that the Act was not intended to have application to disputes over the sale of commodities.
 
 
 61
 Id. at 145, 62 S.Ct. at 521 (citations omitted). Distinguishing its previous decisions, the Court further explained:
 
 
 62
 We recognize that by the terms of the statute [i.e., 29 U.S.C. § 113(c) ] there may be a "labor dispute" where the disputants do not stand in the proximate relation of employer and employee. But the statutory classification, however broad, of parties and circumstances to which a "labor dispute" may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing. Our decisions in New Negro Alliance v. Sanitary Grocery and Milk Wagon Drivers' Union v. Lake Valley Farm Products, give no support to the [union's] contention [that the Norris-LaGuardia Act applies], for in both cases the employer-employee relationship was the matrix of the controversy.
 
 
 63
 Id. at 146-47, 62 S.Ct. at 522 (emphasis added).[12]
 
 
 64
 More recently, in Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Association, 457 U.S. 702, 712-13, 102 S.Ct. 2672, 2680, 73 L.Ed.2d 327 (1982), the Supreme Court found that in a suit between an employer and a union over the correct interpretation of the collective-bargaining agreement which was in existence between the two, the "employer-employee relationship [was] the matrix of the controversy" and that the suit, therefore, involved a "labor dispute." Thus, the Court held that under the anti-injunction provisions of the Norris-LaGuardia Act, the union could not be enjoined from striking.[13]
 
 
 65
 As suggested by the language of 29 U.S.C. § 113(c), a labor dispute exists regardless of whether the disputants stand in the "proximate relation of employer and employee," so long as an employer-employee relationship is at the heart of the dispute. For example, in Burlington Northern Railroad Co. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), the Brotherhood of Maintenance of Way Employees ("BMWE"), which represents railroad employees nationwide, had a dispute over the renewal of a collective-bargaining agreement with a small railroad owned by Guilford Transportation Industries, Inc. ("Guilford"). When negotiations reached an impasse, BMWE instituted a strike against Guilford and other rail carriers with which it exchanged traffic, including Burlington Northern. Burlington Northern, in turn, sought and obtained a preliminary injunction against BMWE's strike activity, and BMWE appealed to the Supreme Court.
 
 
 66
 The issue before the Court was whether BMWE's secondary picketing of Burlington Northern could be enjoined. The Court began by observing that "the [Norris-LaGuardia Act] reflects Congress' decision to abolish, for purposes of labor immunity, the distinction between primary activity between the immediate disputants and secondary activity in which the employer and the members of the union do not stand in the proximate relation of employer and employee." Id. at 439, 107 S.Ct. at 1848 (quotations and citations omitted). With respect to Burlington Northern's contention that the Norris-LaGuardia Act was inapplicable because the dispute between it and BMWE did not "involv[e] or grow[ ] out of a labor dispute," the Court commented that the union's dispute with Guilford "over the terms and conditions of employment is unquestionably a labor dispute, and the secondary activity against [Burlington Northern] grows out of that dispute." Id. at 440, 107 S.Ct. at 1848. Furthermore, resolving a split among the circuits, the Court declined to require that the picketed employer be "substantially aligned" (i.e., linked economically or otherwise) with the primary employer for there to be a finding of protected secondary activity, stating:
 
 
 67
 [I]t would be particularly anomalous to adopt a narrowing construction of the phrase "growing out of a labor dispute" in the context of secondary picketing, because Congress' primary motivation in passing the Norris-LaGuardia Act was to immunize such picketing from federal-court injunctions. Were we to limit the scope of [section 13] as [Burlington Northern] suggest[s], we would again commit precisely the error that prompted Congress to pass the Act.
 
 
 68
 Id. at 442, 107 S.Ct. at 1849. Because a bona fide dispute over the terms and conditions of employment was at the "matrix of the controversy" between Burlington Northern and BMWE, the Court held that under the Norris-LaGuardia Act, the lower court did not have jurisdiction to enjoin BMWE's secondary strike, even though the disputants did not stand in the proximate relation of employer and employee.[14]
 
 
 69
 In the instant case, the dispute between Burlington Northern and Local 174 did not "involve or grow out of a labor dispute" as that phrase has been defined by the foregoing cases. In the court a quo, Local 174 expressly disavowed any intent on its part of establishing a collective-bargaining relationship with the railroad.[15] In addition, Local 174 stated that its actions with respect to Burlington Northern would not affect its collective-bargaining efforts with any other employer. See Supplemental Excerpts of Record at 20 ("[T]his is not a dispute between a carrier and it employees as to who represents the employees") and Appellants' Excerpt of Records at 5 ("Nor does Local 174 wish [Burlington Northern] to encourage, induce, force, or require any such contractor or any other person to recognize or bargain with Local 174 or any other labor organization"). Thus, it is clear that the instant controversy involves neither a primary labor dispute nor secondary activity incident to such a dispute. Finally, there is no evidence whatsoever in the record that Local 174 has an ongoing dispute with any employer, much less Burlington Northern, concerning the terms and conditions of its members' employment.[16] Simply, there is no nexus between Local 174's activities with respect to Burlington Northern and its legitimate objectives as a labor union. Accordingly, as an employer-employee relationship is not "the matrix of the controversy" between the parties hereto, there is no labor dispute, and the anti-injunction provisions of the Norris-LaGuardia Act are inapplicable.[17]
 
 
 70
 2. The "Nonstatutory Exemption" From The Federal Antitrust Laws Is Likewise Inapplicable Under The Circumstances.
 
 
 71
 Alternatively, Local 174 contends that because its "actions are intended to reduce wage-based competition in the intermodal industry by preventing [Burlington Northern] from using non-union contractors who pay wages far lower than those paid by unionized contractors," its agreement with the railroad is immunized from antitrust liability by operation of the "nonstatutory exemption" from the federal antitrust laws that is afforded labor organizations acting in pursuit of their legitimate goals.[18] Brief of Appellants at 25. Conversely, Burlington Northern maintains that the nonstatutory exemption is inapplicable because Local 174's proposed agreement with it is unrelated to any efforts by the union to induce collective bargaining with the railroad or any other employer and does not involve wages, hours, or conditions of employment.
 
 
 72
 Together, section 20 of the Clayton Act and section 4 of the Norris-LaGuardia Act declare that labor unions, acting alone, are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. The collective effect of these provisions is known as the labor or "statutory exemption" from the antitrust laws. See United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941)(first recognizing the statutory exemption). Neither the Clayton nor Norris-LaGuardia Acts, however, expressly deals with the legality vis-a-vis the antitrust laws of arrangements or agreements between unions and nonlabor parties, such as employers and trade associations. Nonetheless, the Court has recognized that "a proper accommodation between the congressional policy favoring collective bargaining ... and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." Connell Construction Company, Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)(citing Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965)) (emphasis added).
 
 
 73
 Labor's nonstatutory exemption from the antitrust laws has its source in the strong congressional policy favoring collective bargaining by employees with their employers to eliminate competition over wages and working conditions. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940)(first recognizing nonstatutory exemption). The Supreme Court explained in Connell Construction Co.:
 
 
 74
 Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, the nonstatutory exemption offers similar protection when a union and a nonlabor party agree to restrain competition in a business market.
 
 
 75
 Id. at 622, 95 S.Ct. at 1835. Since Apex Hosiery, the Supreme Court has endeavored to delineate the contours of the nonstatutory exemption. Where agreements between unions and nonlabor parties concern wages, hours, and working conditions and arise in the context of a collective-bargaining effort, the Court has generally found the nonstatutory exemption applicable. However, where an agreement between a union and a nonlabor party has the primary purpose and/or effect of restraining competition in a given market, the nonstatutory exemption affords the parties no protection from the antitrust laws.
 
 
 76
 For example, in Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 808, 65 S.Ct. 1533, 1539, 89 L.Ed. 1939 (1945), the Court found that a combination among labor unions, employers, and manufacturers to restrain trade in, and to monopolize the marketing of, electrical equipment in New York City violated the Sherman Antitrust Act. Although it recognized that a provision in a collective-bargaining agreement between a union and employer, whereby the employer agrees not to buy goods manufactured by companies which do not employ members of the union, "standing alone" would not violate the Sherman Antitrust Act, the Court found that under the facts before it, such an agreement was only part and parcel of a larger, multiparty effort to control the market. Id. at 809, 65 S.Ct. at 1539-40. The Court explained:
 
 
 77
 [The union-employer] agreement was but one element in a far larger program in which contractors and manufacturers united with one another to monopolize all the business in New York City, to bar all other business men from that area, and to charge the public prices above a competitive level. It is true that victory of the union in its disputes, even had the union acted alone, might have added to the cost of goods, or might have resulted in individual refusals of all of their employers to buy electrical equipment not made by [union members]. So far as the union might have achieved this result acting alone, it would have been the natural consequence of labor union activities exempted by the Clayton Act from the coverage of the Sherman Act. But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts.
 
 Id. (citations omitted).[19]
 
 78
 In Connell Construction Co., Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975)-a case factually similar to the case sub judice-a union (Local 100), which represented the plumbing and mechanical trades, was a party to a multi-employer bargaining agreement with the Mechanical Contractors Association of Dallas, an association of approximately 75 mechanical subcontractors. Local 100 approached several non member general contractors, including Connell Construction Co. ("Connell"), and demanded that they sign an agreement, obligating themselves to subcontract their plumbing and mechanical work only to firms that had a current collective-bargaining relationship with the union. In the proposed agreement, Local 100 expressly disavowed any intention of seeking recognition as the collective-bargaining representative of the employees of any of the general contractors. When Connell refused to concede to Local 100's demands, the union picketed the company's major construction sites. Eventually, economic pressures caused Connell to sign the subcontracting agreement under protest. Thereafter, Connell filed suit against Local 100, contending that the agreement violated the Sherman Antitrust Act.
 
 
 79
 The Court began its analysis by recognizing that the nonstatutory exemption from the antitrust laws operates to allow a union to bargain and enter into agreements with nonlabor parties for the purposes of eliminating differences in wages and improving/standardizing working conditions. However, the court observed:
 
 
 80
 The agreements with Connell and other general contractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect.
 
 
 81
 Id. at 623, 95 S.Ct. at 1835 (emphasis added). Focusing on the effect that the questioned agreement would have on the local market, the Court further observed:
 
 
 82
 Success in exacting agreements from general contractors would also give Local 100 power to control access to the market for mechanical subcontracting work. The agreements with general contractors did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100. The union thus had complete control over subcontract work offered by general contractors that had signed these agreements. Such control could result in significant adverse effects on the market and on consumers-effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions. For example, if the union thought the interests of its members would be served by having fewer subcontractors competing for the available work, it could refuse to sign collective bargaining agreements with marginal firms. Or, since Local 100 has a well-defined geographical jurisdiction, it could exclude "traveling" subcontractors by refusing to deal with them. Local 100 thus might be able to create a geographical enclave for local contractors, similar to the closed market in Allen Bradley.
 
 
 83
 Id. at 624-25, 95 S.Ct. at 1836 (emphasis added). The Court acknowledged that Local 100's goal of organizing as many subcontractors as possible was legal. However, the Court stated that the manner by which Local 100 sought to achieve this goal was not immunized from the antitrust laws by the nonstatutory exemption. The Court explained:
 
 
 84
 Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.
 
 
 85
 [A] restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement. In this case, Local 100 had no interest in representing Connell's employees. The federal policy favoring collective bargaining therefore can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market.
 
 
 86
 Id. at 625-26, 95 S.Ct. at 1836-37 (citations omitted)(emphasis added).
 
 
 87
 Drawing on Connell Construction Co. as well as an Eighth Circuit case, Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976)(first enunciating test), the Ninth Circuit has adopted a three-part test for determining the applicability of the nonstatutory exemption. See Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades District Council, Metal Trades Department, AFL-CIO, 817 F.2d 1391 (9th Cir.1987). Under this test, the parties to an agreement restraining trade are exempt from antitrust liability if (1) the restraint primarily affects the parties to the agreement and no one else; (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining; and (3) the agreement is produced from bona fide, arm's-length collective bargaining. Id. at 614. See also Phoenix Electric Co. v. National Electrical Contractors Association, 81 F.3d 858 (9th Cir.1996)(applying three-part test).
 
 
 88
 In the instant case, Local 174's agreement with Burlington Northern meets none of these requisite conditions. First, the agreement does not primarily affect the parties, but rather indiscriminately excludes subcontractors who do not have collective-bargaining relationships with Local 174 from the intermodal loading and unloading subcontracting market in Seattle. Second, the agreement does not concern wages, hours, or conditions of employment, and third, the agreement is not part of a larger collective-bargaining effort between the parties. If implemented, the questioned agreement would give Local 174 the power to control access to the market by refusing to enter into collective-bargaining agreements with prospective subcontractors. This, in effect, would result in the creation of the type of "geographical enclave" or "closed market," wherein Local 174 could unilaterally exclude subcontractors from the market, even if those subcontractors had competitive advantages derived, not from substandard wages and working conditions, but from more efficient operating methods. See Connell Construction Co., 421 U.S. at 625, 95 S.Ct. at 1836; Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 808, 65 S.Ct. 1533, 1539, 89 L.Ed. 1939 (1945). Such a direct restraint on trade does not "follow naturally from the elimination of competition over wages and working conditions" and "contravenes antitrust policies to a degree not justified by congressional labor policy." Connell Construction Co., 421 U.S. at 625-26, 95 S.Ct. at 1836-37. Accordingly, Local 174 may not avail itself of the nonstatutory exemption from the antitrust laws.
 
 
 89
 D. Merits Of The Antitrust Claim.
 
 
 90
 Having determined that the anti-injunction provisions of the Norris-LaGuardia Act and the nonstatutory exemption from the federal antitrust laws are inapplicable, the court must address the merits of Burlington Northern's antitrust claim. Local 174 contends that Burlington Northern cannot prevail on a claim under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, because a contract, combination, or conspiracy in restraint of trade does not yet exist (i.e., Burlington Northern has not signed the proposed subcontract agreement) and because there is no evidence that the agreement, if executed, would result in an unreasonable restraint of trade. See Brief of Appellants at 37. Burlington Northern maintains that preliminary injunctive relief was proper under section 16 of the Clayton Act, 15 U.S.C. § 26.
 
 
 91
 As discussed above, section 1 of the Sherman Antitrust Act proscribes "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Although broad in scope, the Supreme Court long ago established that the Sherman Antitrust Act was intended to prohibit only those restraints of trade that are unreasonable.[20] See Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). To establish a claim under section 1, the plaintiff must show (1) a contract, combination, or conspiracy (2) that unreasonably restrains trade and (3) that the restraint affected interstate commerce. See Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1410 (9th Cir.), cert. denied, 502 U.S. 994, 112 S.Ct. 617, 116 L.Ed.2d 639 (1991). But for the narrow range of practices that experience has proven to be so likely to interfere with competition that they violate the Sherman Antitrust Act per se,[21] the courts have, since 1911, applied the "rule of reason" analysis to determine whether a challenged practice unreasonably restrains trade. See Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911). Under the rule of reason analysis, the "factfinder must analyze the anticompetitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance."[22] Bhan, 929 F.2d at 1412-13. The fact finder's focus should be "on the actual effects that the challenged restraint has had on competition in a relevant market." Id. at 1410. See also id. at 1413 (detailing the burden-shifting analysis under the rule of reason); American Ad Management, Inc. v. GTE Corp., 92 F.3d 781 (9th Cir.1996)(same).
 
 
 92
 Section 1 of the Sherman Antitrust Act is actionable by a private plaintiff only through sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Section 4 provides in pertinent part:
 
 
 93
 [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue thereunder in any district court of the United States in the district in which the defendant resides ... and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee....
 
 
 94
 15 U.S.C. § 15(a). And, section 16 provides in pertinent part:
 
 
 95
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of the proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.
 
 
 96
 15 U.S.C. § 26 (emphasis added). See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 111, 107 S.Ct. 484, 490, 93 L.Ed.2d 427 (1986)("[Section] 16 affords private plaintiffs injunctive relief only for those injuries cognizable under [section] 4"). Whereas to recover under section 4, a private claimant must prove actual antitrust injury, section 16, "which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened injury.' " Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969)(emphasis added). Thus, to obtain injunctive relief under section 16 of the Clayton Act, a private plaintiff need only demonstrate (1) "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur" and (2) one of the two traditional equitable criteria.[23] Id.
 
 
 97
 Judged by these standards, the district court did not abuse its discretion by entering a preliminary injunction against Local 174. In its August 13, 1997 "Order Granting Plaintiff's Motion For A Preliminary Injunction," the district court stated:
 
 
 98
 The Sherman Anti-Trust Act makes every contract, combination, or conspiracy in restraint of trade illegal. 15 U.S.C. § 1. Although not a per se violation, the proposed agreement between Local 174 and [Burlington Northern] would reduce or eliminate competition among subcontractors for the loading and unloading work at [Burlington Northern's] local intermodal hubs. Because the agreement does not seek to enforce wage and working-condition standards or require [Burlington Northern] to hire union-only subcontractors, as opposed to Local 174-only subcontractors, its aim appears to be primarily anti-competitive.
 
 
 99
 Excerpts of Record at 19. With respect to the prerequisite of irreparable damage, the district court stated:
 
 
 100
 Although the injury that [Burlington Northern] would suffer without an injunction is primarily economic, legal remedies would likely be inadequate. For one thing, substantial goodwill might be lost as a result of the picketing and the subsequent work stoppage, the value of which would be nearly impossible to measure. In addition, a work stoppage at the Seattle hub would have a ripple effect across the country, causing potentially great and unknown loss to third parties.
 
 
 101
 Excerpts of Record at 19-20.
 
 
 102
 Upon review of the record, it appears substantially likely that Burlington Northern-the primary consumer of intermodal loading and unloading services in the Seattle area[24]-would suffer directly from Local 174's proposed subcontracting agreement by having to pay more for such services than it would otherwise have to pay in an open market. In fact, Local 174 has admitted that "non-union contractors ... pay wages far lower than those paid by unionized contractors." Brief of Appellants at 25. See also American Ad Management, Inc. v. GTE Corp., 92 F.3d 781, 790 (9th Cir.1996)(indicating that "higher prices" are the most "typical example of anti-competitive effect"); Amarel v. Connell, 102 F.3d 1494, 1509 (9th Cir.1997)("Another form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives") (quotations and citations omitted). By making non-Local 174 subcontractors, including those organized by other unions, "ineligible to compete for" a substantial "portion of the available work" at intermodal terminals in Seattle, the proposed agreement would significantly curtail efficiency-based competition in the Seattle-area intermodal container loading and unloading market. Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 626, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975). Such an anticompetitive agreement is the type of harm that the antitrust laws were specifically designed to remedy. See id. Moreover, Local 174 has not put forth a single pro-competitive rationale for its proposed subcontracting agreement. Accordingly and in light of the foregoing analysis, we hold that the district court acted well within the scope of its discretion in enjoining Local 174's efforts to effect the subcontracting agreement in question by threatening to picket Burlington Northern's Seattle-area hubs.[25]E. This Matter Is Not Subject To The Primary Or Exclusive Jurisdiction Of The NLRB
 
 
 103
 Finally, Local 174 contends that because Burlington Northern voluntarily submitted this action to the jurisdiction of the NLRB by filing an unfair labor practices charge, the district court should have deferred to that agency's primary or exclusive jurisdiction.[26] This contention, however, is based on a false premise, i.e., that Local 174 was involved in a primary "labor dispute" with Parsec and/or other non-Local 174 loading and unloading subcontractors and that its actions with respect to Burlington Northern were secondary to that dispute. See Reply Brief of Appellants, Appendix A (NLRB Advice Memorandum). Certainly, the NLRB has the authority, upon the filing of an unfair labor practices charge, to condemn, and seek an injunction of, many forms of secondary activity. See 29 U.S.C. §§ 158(b)(4), 160(j) & 160(l ).[27] As established above, however, this suit does not involve a labor dispute and, thus, falls outside of the NLRB's sphere of expertise.[28] See Appellants' Excerpts of Record at 16 ("[T]his case does not involve or grow out of a labor dispute"). Accordingly, the NLRB does not have primary or exclusive jurisdiction over this matter.[29]
 
 III. CONCLUSION
 
 104
 The district court's conclusions (1) that the Norris-LaGuardia Act and RLA were inapplicable to the instant controversy; (2) that there was a substantial likelihood that Local 174's threatened actions were violative of the federal antitrust laws; and (3) that said actions had the potential to cause irreparable harm to Burlington Northern were not clearly erroneous. Accordingly, the district court's order preliminarily enjoining Local 174 from picketing Burlington Northern is AFFIRMED.
 
 TASHIMA, Circuit Judge, dissenting:
 
 105
 I respectfully dissent. I disagree with the majority's holding that the dispute between BNSF and Local 174 was not a labor dispute within the meaning of the Norris-LaGuardia Act ("NLGA"), thus rendering its anti-injunction provisions inapplicable. I also disagree that this record supports the issuance of a preliminary injunction under the Clayton Act. I would hold that a dispute between an employer and its subcontractor's employees involving the issue of whether those employees would have any work at all is a labor dispute under the broad contours of the NLGA; thus, that its anti-injunction provisions apply.
 
 I.
 
 106
 The majority argues that there was not a labor dispute between BNSF and Local 174 because these parties are not in an employer-employee relationship. Maj. op. at 911-12. The majority reasons that since Local 174 never had an intent to establish a collective bargaining relationship with BNSF, the dispute between the parties did not involve or grow out of a labor dispute. Maj. op. at 911. I cannot agree.
 
 
 107
 The majority relies primarily on Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942), and Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). Although these cases do hold that the employer-employee relationship must be at the matrix of the controversy for the NLGA to apply, id. at 712, 102 S.Ct. 2672; Columbia River Packers, 315 U.S. at 146-47, 62 S.Ct. 520, this reasoning ignores the fact that the Supreme Court has consistently construed the term "labor dispute" in the NLGA in the very broadest of terms, finding only very limited exceptions to the Act's anti-injunction provisions, none of which applies in this case. A close examination of the applicable law demonstrates that the labor dispute between BNSF and Local 174 unquestionably falls within the boundaries of the NLGA.
 
 
 108
 From the Act's inception, the Court has construed the term "labor dispute" broadly. See, e.g., New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 562, 58 S.Ct. 703, 82 L.Ed. 1012 (1938) (holding that labor disputes were not limited to those disagreements between employers and their direct employees); Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, 311 U.S. 91, 103, 61 S.Ct. 122, 85 L.Ed. 63 (1940) (holding that labor disputes under the NLGA included secondary strikes). In Order of R.R. Telegraphers v. Chicago & N.W. Ry., 362 U.S. 330, 335, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960), the Court again signaled that the term "labor dispute" should be expansively interpreted.
 
 
 109
 Congress made the definition [of NLGA labor disputes] broad because it wanted it to be broad. There are few pieces of legislation where the congressional hearings, committee reports, and the language in the legislation itself more clearly point to the necessity for giving an Act a construction that will protect the congressional policy the Act adopted. Section 2 of this Act specifies the public policy to be taken into consideration in interpreting the Act's language and in determining the jurisdiction and authority of federal courts; it is one of freedom of association, organization, representation and negotiation on the part of workers.
 
 
 110
 Id. at 335-36, 80 S.Ct. 761 (emphasis added) (footnote omitted); see also American Fed'n of Musicians v. Carroll, 391 U.S. 99, 112-13, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968) (holding that combinations of non-labor groups and union labor groups were covered under NLGA and protected from injunctions). Under this broad definition of "any relation of employment," the absence, as here, of a direct employer-employee relationship, will not defeat the existence a labor dispute. See 29 U.S.C. § 113(c).
 
 
 111
 Moreover, the Court has defined labor disputes to include both politically motivated work stoppages and secondary picketing. In Jacksonville, the Court held that the NLGA applied to politically-motivated work stoppages. See Jacksonville, 457 U.S. at 712, 102 S.Ct. 2672. The Court noted specifically that "[t]his Court has consistently given the anti-injunction provisions of the Norris-LaGuardia Act a broad interpretation, recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy."[1] Id. at 708, 102 S.Ct. 2672 (emphasis added).
 
 
 112
 The Jacksonville Court went on to emphasize the "extremely broad" statutory definition of a NLGA labor dispute, id. at 712, 102 S.Ct. 2672, and gave specific guidance as to its breadth:
 
 
 113
 The Act's language is broad. The language is broad because Congress was intent upon taking the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act.
 
 
 114
 Id. at 712, 102 S.Ct. 2672 (emphasis in original) (citations omitted). See also Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 441, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (holding that federal court lacked jurisdiction to enjoin secondary picketing in railway labor cases, and declining to construe 29 U.S.C. § 113(c) narrowly). The majority's exclusion of the instant dispute runs contrary to the Supreme Court's repeated and specific instructions to interpret the NLGA as broadly as possible.
 
 
 115
 The narrow class of exceptions to this broad reading of the NLGA almost exclusively concerns the sale of commodities. In Hinton, the Court found that a controversy between a fishermen's association and a businessman was outside the boundaries of a NLGA labor dispute. Noting that the controversy was between fish sellers and fish buyers, the Court held that:
 
 
 116
 [A] dispute among businessmen over the terms of a contract for the sale of fish is something different from a controversy concerning terms or conditions of employment.... [T]he attention of Congress was focussed upon disputes affecting the employer-employee relationship, and ... the Act was not intended to have application to disputes over the sale of commodities.
 
 
 117
 Hinton, 315 U.S. at 145, 62 S.Ct. 520 (quotations omitted) (emphasis added).
 
 
 118
 The majority argues that Hinton illustrates the Court's narrowing of the NLGA's application. This argument, however, is misdirected. Local 174's controversy with BNSF does not concern the "sale of commodities," but concerns the actual existence of work for Local 174. BNSF's termination of its contract with Eagle System caused 53 members of Local 174 to lose their jobs.
 
 
 119
 The majority's reliance on Bakery Sales Drivers, Local Union No. 33 v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792 (1948), is equally misplaced. Like Hinton, Bakery Sales involved a controversy over the sale of commodities. The Court held that the controversy over the amount of the bill for bread was between the store and the bakery, and did not become a "labor dispute" merely because a representative of the bakery drivers union collected the bill. The Court differentiated this controversy from NLGA "labor disputes" by its overwhelming business context:
 
 
 120
 To hold that under such circumstances a failure of two businessmen to come to terms created a labor dispute merely because what one of them sought might have affected the work of a particular employee of the other, would be to turn almost every controversy between sellers and buyers over price, quantity, quality, delivery, payment, credit, or any other business transaction into a "labor dispute."
 
 
 121
 Id. at 443, 68 S.Ct. 630 (emphasis added) (citation omitted). Contrary to the majority's interpretation of Bakery Sales, the Court's criticism was not pointed at labor disputes, such as that between BNSF and Local 174, which do not concern the sale of commodities or payments between businessmen.
 
 
 122
 The Court has continued to distinguish controversies over the sale of commodities from genuine labor disputes. In Los Angeles Meat & Provision Drivers Union v. United States, 371 U.S. 94, 102, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962), the Court held that grease peddlers who were "sellers of commodities," and who joined the union only to further an illegal conspiracy to restrain trade, were not intended to be covered by the NLGA. The Court underlined Hinton 's holding that the Act was "not intended to have application to disputes over the sale of commodities," id. (quoting Hinton, 315 U.S. at 145, 62 S.Ct. 520), but was careful to point out that "both the Norris-LaGuardia Act and the Clayton Act ensure that the antitrust laws cannot be used as a vehicle to stifle legitimate labor union activities." Id. at 103, 83 S.Ct. 162.
 
 
 123
 An examination of the facts demonstrates that the labor dispute between BNSF and Local 174 falls within the boundaries of the NLGA. The present dispute began when BNSF terminated its contract with Eagle Systems (whose employees were represented by Local 174), causing 53 members of Local 174 to lose their jobs. Despite this termination, however, numerous Local 174 members continue to perform work for BNSF pursuant to a contract still in force between Eagle Systems and BNSF. Thus, although BNSF does not directly employ any of Local 174's members, it did and does currently employ a subcontractor which employs them.
 
 
 124
 In response to BNSF's termination of the Eagle Systems contract, Local 174 sent a letter to BNSF asking it to contract only with employers willing to sign collective bargaining agreements with Local 174 and threatened to picket in support of this demand. Although this dispute does not involve "rates of pay, rules, or working conditions" in the usual sense, it does involve the most basic of all working conditions--the very existence of work. Further, the NLGA prohibition on injunctions applies to any dispute "involving or growing out of" a labor dispute. As this court has held, that phrase, "involving or growing out of a labor dispute," is "extraordinarily broad." Camping Const. Co. v. District Council of Iron Workers, 915 F.2d 1333, 1342 (9th Cir.1990). Accordingly, I conclude that the dispute between Local 174 and BNSF is a labor dispute within the meaning of the NLGA and, thus, subject to its anti-injunction provision.
 
 II.
 
 125
 BNSF contends that if there is a labor dispute, the Railway Labor Act, 45 U.S.C. § 151 ("RLA"), applies, because the threatened picketing contravenes the RLA's stated purpose of avoiding any interruption to commerce or operation of any carrier.[2] Unlike the NLGA, however, the RLA requires a direct employer-employee relationship, one which does not exist between BNSF and Local 174's members.
 
 
 126
 Section 151 provides that the term "employee" includes "every person in the service of a carrier ... who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect." 45 U.S.C. § 151 Fifth. We have interpreted this language to require a direct employer-employee connection. In Federal Express Corp. v. Teamster Union, Local # 85, 617 F.2d 524 (9th Cir.1980), we held that a union that was engaged in the secondary picketing of Federal Express did not fall under the RLA. The Federal Express court held that since there was no collective bargaining agreement between the union and Federal Express, there were no obligations under the RLA and the NLGA controlled. See id. at 526. Similarly, in the instant dispute, as there is no collective bargaining agreement between the union and BNSF, no duties under the RLA arise.[3]III.
 
 
 127
 The district court held that even if there was a labor dispute at issue, an injunction would be proper because of the "unlawful acts" exception contained in 29 U.S.C. § 107.[4] Generally, the NLGA prohibits the issuance of an injunction, even if there was an antitrust violation. See 29 U.S.C. § 104.[5] The NGLA does have a limited exception to its general prohibition against injunctions. See 29 U.S.C. § 107.[6] As Local 174 points out, however, the district court did not make the required factual findings for a § 107(a) injunction nor did BNSF attempt to negotiate or mediate the dispute prior to its request for an injunction, as required by 29 U.S.C. § 108.[7] As the NLGA standards for issuing an injunction have not been met, the district court erred in issuing the preliminary injunction.
 
 
 128
 Moreover, it was error to issue an injunction because BNSF did not provide the requisite proof of irreparable injury. Under the Clayton Act, antitrust standing for injunctive relief requires proof of an injury due to "threatened loss or damage by a violation of the antitrust laws ... and upon the ... showing that the danger or irreparable loss or damage is immediate." 15 U.S.C. § 26. The Supreme Court has held that to obtain injunctive relief under the Clayton Act, a private plaintiff must show "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Corp. v. Hazeltine, 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
 
 
 129
 Because this is a "rule of reason" case, the "factfinder must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance." Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1413 (9th Cir.1991). The district court did not engage in this required analysis.
 
 
 130
 Here, the threatened loss that BNSF will suffer from most greatly is due to the picketing, not the anti-competitive agreement. While the district court discussed the anti-competitive effects of the proffered agreement, it focused primarily on the harm associated with the threatened picketing, rather than the alleged antitrust violation. In granting the preliminary injunction, the district court found that "substantial goodwill might be lost as a result of the picketing and the consequent work stoppage, the value of which would be nearly impossible to measure.... [A] work stoppage at the Seattle hub would have a ripple effect across the country, causing potentially great and unknown loss to third parties." Dist. Ct. Order of Aug. 13, 1997 at 9 (emphasis added). Considering that the injunction was issued under the Clayton Act, the district court's focus on the possible harm from the picketing, as opposed to any anti-competitive effect of the agreement, was misplaced. The negative effects of picketing, standing alone, is an insufficient basis upon which to issue an antitrust injunction.
 
 
 131
 BNSF argues that Local 174's proposed agreement would eliminate competition from other unions and their members in the market for representation of terminal operations workers, which would have serious effects on BNSF's efficiency. As Local 174 points out, however, this is all conjecture. While the original proposed agreement may have violated the antitrust laws, no such agreement was reached, and Local 174 has repeatedly declared its willingness to be flexible in negotiations. The hypothetical terms of such a theoretical agreement are not enough to justify issuance of a preliminary injunction.
 
 
 132
 More importantly, the district court did not enjoin the enforcement of the union's proposed agreement, but enjoined the union's proposed picketing. The record is devoid of any evidence to show that BNSF would suffer irreparably from the allegedly anticompetitive agreement, as opposed to the threatened picketing; thus, because it is unsupported by any evidence of irreparable harm, it was error to issue a preliminary injunction.[8]
 
 IV.
 
 133
 I conclude first that there was a labor dispute under the NLGA and that the "unlawful acts" exception is inapplicable. I further conclude that BNSF has failed to make the minimum showing required for the issuance of a preliminary injunction under the Clayton Act. I would, therefore, vacate the district court's preliminary injunction.
 
 
 
 *
 Honorable Tom Stagg, Senior United States District Judge for the Western District of Louisiana, sitting by designation
 
 
 [1]
 The district court enjoined Local 174 from:
 A. Calling, ordering, authorizing, encouraging, inducing, approving, continuing, starting, suffering, permitting or carrying out any strike, picketing or work stoppage on the Plaintiff's [Burlington Northern's] railroad;
 B. Engaging in unlawful activities, including but not limited to the withholding of their services in violation of provisions in existing agreements and rules between the parties;
 C. Interfering with ingress and egress from Plaintiff's premises;
 D. Interfering in any manner with the delivery, loading, unloading, dispatch or movement of any of Plaintiff's rolling stock, engines, cars, equipment or trains, or any of the contents thereof; and
 E. In any manner interfering with or inducing or endeavoring to induce any person employed by the Plaintiff from performing his or her work and duties and from in any manner endeavoring to induce any such employees to desist therefrom.
 Appellants' Excerpt of Record at 20.
 
 
 [2]
 The district court explained that the RLA did not apply because the case "presented neither a representational dispute nor a 'major' dispute" within the meaning thereof. Appellants' Excerpt of Record at 13. The district court further explained that the Norris-LaGuardia Act's jurisdictional bar did not preclude it from issuing an injunction because the case did not involve a "labor dispute" within the meaning of that statute. Id. at 17
 
 
 [3]
 In International Brotherhood of Electrical Workers, Local No. 501 v. N.L.R.B., 181 F.2d 34, 37 (2d Cir.), affirmed, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), Judge Learned Hand explained that "the gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer and to give in to his employees' demands."
 
 
 [4]
 At its most basic level, the Norris-LaGuardia Act deprives the federal courts of jurisdiction to "issue any restraining order or temporary or permanent injunction in any case involving or growing out of a labor dispute, except in strict conformity with the provisions of [the Act]." 29 U.S.C. § 101. See Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, 311 U.S. 91, 100, 61 S.Ct. 122, 127, 85 L.Ed. 63 (1940)("The Norris-LaGuardia Act ... was intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes"). Among other things, Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, precludes any court from issuing an injunction prohibiting any person "participating or interested in" a labor dispute from doing the following:
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; [and]
 (f) Assembling peaceably to act or to organize to act in promotion of their interest in a labor dispute.
 
 
 [5]
 Because of the unique nature of labor relations in the railway industry, labor disputes involving railroads are governed by a separate act, the RLA, which was enacted by Congress in 1926. See generally Brotherhood of Railroad Trainmen v. Chicago River and Indiana Railroad Co., 353 U.S. 30, 31 n. 1, 77 S.Ct. 635, 636 n. 1, 1 L.Ed.2d 622 (1957) ("The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the [RLA] are not the same as those which form the basis of the [Wagner Act]"). The RLA has since been expanded to cover labor disputes involving air carriers. See 45 U.S.C. § 181. Antitrust Act
 
 
 [6]
 Section 303, as originally enacted, provided in pertinent part:
 (a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where the object thereof is-
 (1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;
 (b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
 
 
 [61]
 Stat. 158-59
 
 
 [7]
 Sections 2(2) and 2(3) of the Wagner Act, 29 U.S.C. § 152(2) & (3), expressly exempt from the Act's coverage employees and employers subject to the RLA. Thus, when a labor union acts on behalf of employees subject to the RLA in a labor dispute, the union is, pro tanto, exempt from the Wagner Act and, thus, from the jurisdiction of the NLRB. See 29 U.S.C. § 152(5). However, where a union which is engaged in a labor dispute with a Wagner Act employer brings unlawful secondary pressure on an RLA-employer, the RLA-employer is entitled to seek NLRB protection. See Local Union No. 25, International Brotherhood of Teamsters v. New York, New Haven and Hartford Railroad Co., 350 U.S. 155, 160, 76 S.Ct. 227, 231, 100 L.Ed. 166 (1956)("[S]ince railroads are not excluded from the [Wagner Act's] definition of "person," they are entitled to [NLRB] protection from the kind of unfair labor practice proscribed by section 8(b)(4)(A)")
 
 
 [8]
 Black's Law Dictionary defines a "hot cargo agreement" as
 a voluntary agreement between union and neutral employer by which latter agrees to exert pressure on another employer with whom union has a dispute; by, for example, ceasing or refraining from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer the union has labeled as unfair or "hot."
 Black's Law Dictionary 738 (6th ed.1990). See also National Woodwork Manufacturers Association v. N.L.R.B., 386 U.S. 612, 634, 87 S.Ct. 1250, 1257, 18 L.Ed.2d 357 (1967).
 Because section 8(b)(4)(A) required, as a prerequisite to liability thereunder, force or coercion on the part of the union, it was, according to the Carpenters Court, not a violation of that section to voluntarily enter into a "hot cargo" agreement.
 
 
 [9]
 Section 8(b)(4) now provides in pertinent part:
 (b) It shall be an unlawful labor practice for a labor organization or its agents-
 (4) (i) to engage in, or to induce or encourage any individual employer by any person engaged in commerce or in any industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization to enter into any agreement which is prohibited by subsection (e) of this section.
 ....
 29 U.S.C. § 158(b)(4)(A). The original text of section 8(b)(4)(A), which prohibits secondary union activity in general, was retained in substantial part, but redesignated as section 8(b)(4)(B).
 
 
 [10]
 Section 303 now provides:
 (a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title [i.e., section 8(b)(4) of the Wagner Act as amended].
 (b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title [i.e., section 301 of the Taft-Hartley Act] hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
 29 U.S.C. § 187.
 
 
 [11]
 The enactment of comprehensive legislation governing labor relations in the 1930's and 1940's, specifically the Wagner Act, did not have the effect of repealing the Norris-LaGuardia Act's provisions against judicial interference in "labor disputes." See Montgomery Ward Employees' Association v. Retail Clerks International Protective Association Local No. 47, 38 F.Supp. 321 (D.Cal.1941)
 
 
 [12]
 See also Bakery Sales Drivers Local Union No. 33 v. Wagshal, 333 U.S. 437, 68 S.Ct. 630, 92 L.Ed. 792 (1948)("To hold that ... a failure of two businessmen to come to terms created a labor dispute merely because what one of them sought might have affected the work of a particular employee of the other, would be to turn almost every controversy between sellers and buyers over price, quantity, quality, delivery, payment, credit, or any other business transaction into a 'labor dispute' ")
 
 
 [13]
 See also Camping Construction Co. v. District Council of Iron Workers, 915 F.2d 1333 (9th Cir.1990), cert. denied, 500 U.S. 905, 111 S.Ct. 1684, 114 L.Ed.2d 79 (1991), and cert. denied, 500 U.S. 953, 111 S.Ct. 2260, 114 L.Ed.2d 713 (1991)(holding that an issue over whether a "prehire" collective-bargaining agreement had been repudiated was a labor dispute within the meaning of the Norris-LaGuardia Act and that injunctive relief staying arbitration thereunder was, therefore, unavailable)
 
 
 [14]
 See also Smith's Management Corp. v. International Brotherhood of Electrical Workers, Local Union No. 357, 737 F.2d 788, 789 (9th Cir.1984)(holding that under the Norris-LaGuardia Act, secondary picketing by union of company with which primary employer had contractual relationship could not be enjoined because union had an ongoing dispute with primary employer which concerned "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment")(citing 29 U.S.C. § 113(c))
 
 
 [15]
 Chiefly because of this fact, we remain unswayed by the argument put forth by amici, the National Railway Labor Conference and the Airline Industrial Relations Conference, that the dispute between Local 174 and Burlington Northern is a major or representational dispute within the meaning of the RLA. At page 20 of their brief, amici submit the following:
 Local 174 admits that it seeks an agreement from [Burlington Northern] restricting the carrier's rights to subcontract work at the railroad's intermodal hub in Seattle. This plainly constitutes an attempt to engage in collective bargaining with [Burlington Northern] over a contract demand that is a subject of bargaining between the railroad and the unions that represent carrier employees. That demand directly affects the working conditions of [Burlington Northern] employees, as it concerns work which those employees also claim....
 Because Local 174 seeks to engage in collective bargaining with [Burlington Northern], the union is required to follow the dispute resolution provisions of the RLA.
 Brief of Amici at 20-21. The fatal flaw in amici 's argument is that Local 174 is not a certified collective bargaining representative of any of Burlington Northern's employees, nor has it instituted the procedures necessary to obtain certification under the RLA. See 45 U.S.C. § 152, Third, Fourth & Ninth.
 
 
 [16]
 In fact, counsel for Local 174 admitted at the preliminary injunction hearing that "this is not a dispute over rates of pay, rules, and working condition[s]." Supplemental Excerpts of Record at 20
 
 
 [17]
 Because there is no labor dispute between the parties, we need not address Burlington Northern's alternative contention that "[t]he preliminary injunction should be affirmed because the Teamsters' threats violate the Railway Labor Act's comprehensive scheme for resolving labor disputes in the rail industry." Brief of Appellee at 48. See Fennessy v. Southwest Airlines, 91 F.3d 1359, 1361 (9th Cir.1996), cert. denied, 520 U.S. 1210, 117 S.Ct. 1692, 137 L.Ed.2d 819 (1997) ("Congress adopted the RLA to provide 'a comprehensive framework for the resolution of labor disputes in the railroad industry' ") (quoting Atchison, Topeka & Santa Fe Railway Co. v. Buell, 480 U.S. 557, 562-63, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563 (1987)) (emphasis added)
 
 
 [18]
 Burlington Northern argues that this issue was not raised in the district court and, therefore, cannot be raised for the first time on appeal. See Sofamor Danek Group, Inc. v. Brown, 124 F.3d 1179, 1186 n. 4 (9th Cir.1997). However, because the issue of the applicability of the nonstatutory exemption from the antitrust laws is so closely related to the issue of whether the instant controversy concerns a labor dispute within the meaning of the Norris-LaGuardia Act, it is difficult, if not impossible, to consider one without the other
 
 
 [19]
 See also Los Angeles Meat and Provision Drivers Union, Local 626 v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962)(neither the Norris-LaGuardia Act nor the labor exemption provision of the Clayton Act prevented district court from ordering the termination of an illegal combination between independent "grease peddlers" and a union to restrain trade in the Los Angeles-area "yellow grease" market); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)(applying the "Allen Bradley doctrine" in dispute between operators of small coal mines and miners' union over anticompetitive effect of industry-wide collective-bargaining agreement)
 
 
 [20]
 In Les Shockley Racing, Inc. v. National Hot Rod Association, 884 F.2d 504 (9th Cir.1989), we explained:
 Every agreement concerning trade, every regulation of trade, restrains. Only when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions such as price setting, resource allocation, market entry, or output designation is a violation of the Sherman Act threatened.
 Id. at 508 (quotations and citations omitted).
 
 
 [21]
 Trade practices that are illegal per se under the Sherman Antitrust Act include horizontal price fixing, the division of markets among competitors, certain product tying arrangements, and some group boycotts. See Hahn v. Oregon Physicians' Service, 868 F.2d 1022 (9th Cir.1988), cert. denied, 493 U.S. 846, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989). The Supreme Court has instructed that the per se approach is not to be expanded to new arrangements or business relationships with which the courts are inexperienced. See F.T.C. v. Indiana Federation of Dentists, 476 U.S. 447, 458-59, 106 S.Ct. 2009, 2017-18, 90 L.Ed.2d 445 (1986)
 
 
 [22]
 In Bhan, we suggested that the fact finder should weigh the following considerations in determining whether the challenged practice is on balance unreasonable:
 First, what harm to competition results or may result from the collaborator's activities? Second, what is the object they are trying to achieve, and is it a legitimate and significant one; that is, what are the nature and magnitude of the "redeeming virtues" of the challenged collaboration? Third, is the restraint reasonably necessary for the achievement of any such legitimate objectives? That is, are there other and better ways-so called less restrictive alternatives-by which the collaborators can achieve their legitimate objectives with fewer harms to competition?
 Bhan, 929 F.2d at 1410 (7 P. Areeda, Antitrust Law p 1502, at 371 (1986)).
 
 
 [23]
 "Traditional equitable criteria require the plaintiff to show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor." Lucas v. Bechtel Corp., 800 F.2d 839, 847 (9th Cir.1986)
 
 
 [24]
 In fact, Burlington Northern and Union Pacific are the only two rail carriers providing intermodal service on the West Coast, and Burlington Northern is by far the larger of the two in Seattle. Brief of Appellee at 42
 
 
 [25]
 Although any antitrust injury to Burlington Northern would ultimately emanate from the proposed subcontracting agreement itself, we believe that the district court, in the reasonable exercise of its equitable power, had the discretion under section 16 of the Clayton Act to enjoin the union's coercive threat of picketing as part and parcel of a "threatened loss or damage by violation of the antitrust laws." 15 U.S.C. § 26. In other words, without the threat of picketing behind it, Local 174's proposed agreement would be of little or no consequence to Burlington Northern
 
 
 [26]
 In Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 683, 85 S.Ct. 1596, 1598, 14 L.Ed.2d 640 (1965), the Supreme Court stated:
 The doctrine of primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of the issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. The doctrine is based on the principle that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over, and requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.
 (quotations and citations omitted).
 
 
 [27]
 The Court in Jewel Tea further stated:
 Whether a proposed bargaining subject is a term or condition of employment is an issue that the Board frequently determines in considering charges that an employer or union has violated the duty to bargain in good faith concerning "wages, hours, and other terms and conditions of employment," the mandatory subjects of bargaining described in section 8(b) of the National Labor Relations Act.... Such an issue may be raised by an unfair labor practice charge of violation of section 8(a)(5) or section 8(b)(3) through, for example, a refusal to bargain on a mandatory subject of bargaining or insistence on a nonmandatory subject.
 Jewel Tea, 381 U.S. at 685, 85 S.Ct. at 1599-1600 (quotations and citation omitted).
 
 
 [28]
 Even if the court were to find that this controversy involved a "labor dispute," the Supreme Court has addressed and rejected the argument that the matter must be raised before NLRB in the first instance. See Jewel Tea Co., 381 U.S. at 684-88, 85 S.Ct. at 1599-1601 (1965). The Jewel Tea Co. Court explained that where a court has equal expertise with the board and where resort to the board could result in unnecessary delay and expense, deference to the NLRB's administrative procedures is unnecessary. Id
 
 
 [29]
 See Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 626, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975)(holding that an agreement between a union and a nonlabor party, which is wholly-unrelated to any collective-bargaining effort on the part of the union and which operates or threatens to operate as a restraint on trade, may be the basis for a federal antitrust suit); Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 684-88, 85 S.Ct. 1596, 1599-1601, 14 L.Ed.2d 640 (1965); California Dump Truck Owners Association, Inc. v. Associated General Contractors, 562 F.2d 607, 609-10 (9th Cir.1977)
 
 
 [1]
 For example, the Court found one of these limited situations subject to an exception in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 253, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), allowing injunctions in cases in which the employer seeks to enforce the union's collective bargaining obligation to arbitrate grievances rather than to strike over them
 
 
 [2]
 As the majority held there was not a labor dispute, it did not reach this issue
 
 
 [3]
 BNSF cites Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 v. Western Pacific R.R., 809 F.2d 607, 609-10 (9th Cir.1987), for the proposition that "the court must look to the substance of the dispute" to decide whether the RLA applies. Western Pacific held that the district court lacked jurisdiction over a railway labor dispute between the railroad and some of its former employees over the substitution of an intermediary subcontractor. BNSF argues that, similar to Western Pacific, Local 174 is seeking to create labor relations with BNSF, and thus Local 174 has "entered the RLA arena." Western Pacific, however, does not control the instant dispute. The Western Pacific workers were former employees of the carrier and their dispute centered over the interpretation of a transfer agreement executed during the carrier-employee relationship. Here, there never was any agreement between BNSF and Local 174 or its members that was or would be subject to the RLA
 
 
 [4]
 As the majority held that there was no labor dispute, it did not reach this issue
 
 
 [5]
 29 U.S.C. § 104 provides that no court shall have jurisdiction to issue an injunction:
 in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute ... from doing, whether singly or in concert, any of the following acts:
 (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
 (f) Assembling peaceably to act or to organize to act in promotion of their interest in a labor dispute;
 (g) Advising or notifying any person of any intention to do any of the acts heretofore specified....
 
 
 [6]
 29 U.S.C. § 107(a)-(c) provides that no court shall have jurisdiction to issue an injunction, except:
 after hearing the testimony of witnesses in open court (with opportunity of cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect-
 (a) That unlawful acts have been threatened and will be committed unless restrained ...;
 (b) That substantial and irreparable injury to complainant's property will follow;
 (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief....
 
 
 [7]
 29 U.S.C. § 108 provides that:
 No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.
 
 
 [8]
 This case also fails to meet the traditional test for the issuance of a preliminary injunction, which applies to all cases, including antitrust cases, under which the plaintiff must show either "(1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [plaintiff's] favor." Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir.1991) (citation omitted)